*Decision will be entered under Rule 50.*

WELBURN MAYOCK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58957. Filed July 27, 1959.

*Welburn Mayock, Esq., pro se.*
*Thomas J. Donnelly, Jr., Esq.,* for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax and additions to tax of petitioner as follows:

| Year | Deficiency | Addition to tax, sec. 293(b) | Addition to tax, sec. 294(d)(2) |
|---|---|---|---|
| 1948 | $14,333.49 | $7,166.74 | $865.12 |
| 1949 | 797.83 | 398.92 | 23.87 |

Respondent has conceded that the year 1949 is barred by limitations. The parties have settled all adjustments made by respondent to petitioner's income for the taxable year 1948 except one. The issues for decision are:

1. Whether petitioner understated the amount of legal fees received by him from William Lasdon on his income tax return for 1948.

2. Whether any part of the deficiency was due to fraud with intent to evade tax.

3. Whether petitioner's income tax return for the year 1948 was false or fraudulent with intent to evade tax.

4. Whether petitioner substantially underestimated his estimated tax for the year 1948.

### FINDINGS OF FACT.

The petitioner resided in Arlington, Virginia, in 1948 and also maintained a home in California. His individual income tax return for 1948 was filed with the collector of internal revenue in Los Angeles, California.

Petitioner has been a practicing attorney since 1919. During 1948 he maintained a law office and practiced law in Washington, D.C. He also devoted considerable time during such year to the Democratic presidential campaign, serving as counsel to the Democratic National Committee and assisted in obtaining contributions for the Democratic National Committee. In the latter connection he undertook to raise a quota of $30,000 and asked Louis Markus, president of the American Bowling and Billiard Co., who had been one of his principal legal clients, to assist him in obtaining this amount in campaign contributions from people of the Jewish faith in New York City. Subsequently Markus informed petitioner that William Solomon, a mutual acquaintance and one-time political figure in New York, had told him the entire amount could be obtained from one person if petitioner would do such person a favor in Washington, D.C. Petitioner agreed to confer with such person.

William S. Lasdon (hereinafter sometimes referred to as Lasdon) was a resident of the State of New York, and during 1948 was an officer of the Nepera Chemical Co. and the Anahist Co. He and members of his family owned certain patents on antibiotics which they wished to sell to a charitable foundation they had formed. Prior to doing so they wished to obtain a ruling from the Bureau of Internal

Revenue to the effect that any gain from such a sale would be taxed as capital gain rather than ordinary income. In September 1947, Lasdon had requested a tax ruling from the Bureau of Internal Revenue and this request was still pending in 1948. Norman Cann, a practicing attorney in Washington, D.C., had been retained as Washington counsel by Lasdon to apply for the ruling but he had been unable to obtain action on the ruling by the early part of 1948. The requested tax ruling, if favorable, would save William S. Lasdon and members of his family large amounts of Federal income taxes.

William Solomon, who was engaged in the insurance business in New York, was acquainted with William S. Lasdon and his brother, Milton Lasdon. He learned of the Lasdon family tax problem from Milton and advised Milton that petitioner was a lawyer in Washington, D.C., with tax experience and connected with the National Democratic Committee, and that petitioner might prove helpful in resolving the tax problem. Thereafter Solomon arranged a meeting between petitioner and the Lasdons. This meeting took place in petitioner's rooms in the Barclay Hotel in New York City. Solomon left after introducing petitioner to William and Milton Lasdon. After some discussion of the national political situation William Lasdon informed petitioner of his tax problem and stated that it would be worth $25,000 to him if a favorable tax ruling could be obtained. Petitioner told Lasdon he would be unable to do anything for him until after the Democratic National Convention, and Lasdon stated the matter could wait. No agreement was reached at this meeting. Petitioner was disappointed that the amount offered by Lasdon was less than the $30,000 quota he was trying to raise and so informed Markus and Solomon at the former's offices shortly thereafter. Soloman stated Lasdon was just "chiseling," that the matter was worth much more than that amount to him, and asked petitioner if he would split with him and Markus "all we get above what goes to the party, $30,000." Petitioner agreed with Solomon and Markus that they should receive 50 per cent of all that was paid by Lasdon in excess of $30,000 which was to go to the Democratic National Committee.

Solomon arranged another meeting between petitioner and Lasdon which took place in Markus' office at the American Bowling and Billiard Co. in New York in June 1948. At this meeting Lasdon told petitioner the ruling would be worth $65,000 to him and petitioner agreed to try to help him. It was understood no money was to be paid unless a favorable ruling was obtained. Petitioner did not tell Lasdon of any split-fee arrangement between him and Markus and Solomon. Solomon later told petitioner he had told Lasdon all the money was to go to the Democratic National Committee.

William Lasdon and petitioner later conferred with Norman Cann in Washington, D.C., and on July 8, 1948, Lasdon executed a power

of attorney appointing petitioner his attorney to represent him before the Treasury Department in connection with the desired ruling. At this time, Lasdon mailed petitioner a copy of the proposed agreement to sell the patent rights and a letter containing a detailed statement of the transaction. The letter stated as follows:

*DRAFT*

Mr. Welburn Mayock
*324 Bellevue Stratford Hotel*
*Philadelphia, Pennsylvania*
Dear Mr. Mayock:

This letter is for the purpose of giving a detailed statement of the matter which I discussed with you recently.

I and members of my family own all right, title and interest in inventions, patents and patent applications relating to processes for the production of sulfadiazine which were acquired by certain members of the family on May 5, 1941. The patent interests are subject to a license agreement with the American Cyanamid Company dated May 6, 1941. Under this agreement, the American Cyanamid Company is granted an exclusive license to practice and to sublicense others to practice the invention, and to make, use, and sell the product throughout the world. In consideration thereof, American Cyanamid agrees to pay a royalty of 16% of the net sales value of the product sold and 25% of the amount received for any sublicense. The agreement is to remain in effect for a period of 18 years from the date of execution and may be terminated by reason of American Cyanamid Company's bankruptcy or receivership, or failure to make payment of royalties.

Since the date of the license agreement, there have been various transfers of fractional interests by gift or sale among members of the family.

On August 31, 1945, a ruling was obtained from the Bureau of Internal Revenue in which it was held that the invention, patents, patent applications and contract rights held by the Lasdon family are capital assets held for more than six months, and that gain or loss on the sale thereof will constitute long-term capital gain or loss.

The Lasdon family has created a foundation for medical and chemical research, known as the Lasdon Foundation, Inc. On September 8, 1947, a ruling was obtained from the Bureau of Internal Revenue that the Foundation is an exempt organization under the provisions of section 101(6) of the Internal Revenue Code.

On September 16, 1947, a ruling was requested as to a proposed sale of the invention, patents, patent applications and contract rights under the license agreement to the Lasdon Foundation, Inc. Under the terms of the proposed sale, the Foundation would pay the Lasdon family $6,500,000.00 with payments limited to 90% of the amounts received by the Foundation as royalties. After conferences with officials of the Bureau, the terms of the proposed sale were modified in order to meet certain objections which were raised. As modified, the contract price was reduced from $6,500,000.00 to $6,000,000.00 with payments at the rate of $600,000.00 per year for 10 years, without regard to the amount of royalties received by the Foundation. A copy of the modified contract is attached.

After further consideration, however, the Bureau of Internal Revenue refused to issue a favorable ruling and we have recently withdrawn the request for the ruling. It should be noted that no question as to the exempt status of the Foundation is involved. The Bureau has already ruled that under its charter

and the purposes for which it is organized it is an exempt organization. Upon purchase of the patent interests, the income of the Foundation will be devoted to the financing of medical and chemical research and will in no way inure to the benefit of the Lasdon family.

Under the Bureau's ruling of August 31, 1945, the patent interests and contract rights are capital assets in the hands of the Lasdon family. I can see no reason why the Bureau of Internal Revenue should not rule that gain on the proposed sale to the Lasdon Foundation is long-term capital gain. Such a ruling at this time merely carries out the Commissioner's earlier ruling of August 31, 1945, in which it is said:

" * * * it is held that such inventions, and the patents, patent applications and contract rights pertaining thereto, constitute capital assets, and that, the inventions having been held for over six months, gains and losses resulting from the sale thereof will constitute long-term capital gains and losses, in accordance with the provisions of section 117(a) (4) of the Code."

There are ample court decisions including the cases of *Parke, Davis & Co.*, 31 B.T.A. 427, and *Edward C. Myers*, 6 T.C. 258, which have treated income from sales of such interests as capital gain. In these cases the Courts have held that if by reason of the transaction the taxpayer has divested himself of his *entire* interest in the patents or invention, whether in consideration of a flat sum or of payments based upon a percentage of the proceeds of sale of the products of the invention, the resulting gain is to be taxed as capital gain rather than as ordinary income. The Commissioner of Internal Revenue has published his acquiescence in these decisions.

In the event you desire any further information in this matter, I will be pleased to furnish it.

Very truly yours,

WILLIAM S. LASDON

Petitioner discussed the ruling with Cann and Cann prepared a brief of authorities for petitioner to read. Petitioner concluded that the Lasdon family was entitled to a favorable ruling but that the Bureau of Internal Revenue was reluctant to give such a ruling in an election year because of the substantial amount of taxes involved.

Petitioner contacted officials in the Treasury Department in an effort to get action on the Lasdon ruling. He met with the individuals in charge of the ruling and argued for prompt action. In late July of 1948, the presidential campaign was under way and petitioner was unable to devote any of his time to the ruling for 2 or 3 weeks. In August, petitioner again met with officials concerned with the ruling. He then telephoned Lasdon that the ruling was expected in the near future.

In September of 1948, Lasdon received the favorable ruling which he had sought. Shortly thereafter, petitioner and Lasdon met in Marcus' offices at the American Bowling and Billiard Co. in New York City. Lasdon gave petitioner an envelope containing $65,000 in currency.

Lasdon did not claim an expense deduction for the $65,000 on his income tax return for 1948, nor did he file any notice with the Bureau of Internal Revenue that he had paid petitioner a fee of $65,000

for services. Fees which Lasdon paid to Norman Cann in connection with the ruling were deducted by Lasdon's accountants on his income tax returns.

After Lasdon left the meeting at which he had given the $65,000 in currency to petitioner, petitioner set aside $30,000 to be turned over to the Democratic National Committee and divided the remaining $35,000, retaining $17,500 for himself and giving $8,750 to Markus and $8,750 to Solomon. After Solomon left, petitioner loaned $15,000 of the amount he had retained for himself to Markus, for which he received the latter's promissory note. Petitioner then went to the headquarters of the Democratic National Committee in the Biltmore Hotel and delivered the $30,000 in currency which had been set aside to the chairman of the National Finance Committee of the Democratic National Committee. Very shortly thereafter, however, the $30,000 was returned to petitioner with the request that it be made available to the committee in a manner which would not be in violation of the Hatch Act. Petitioner subsequently channeled the $30,000 into the Democratic National Committee through individuals or local political committees who gave their checks payable to the Democratic National Committee in amounts permissible under the Hatch Act. Except for the $17,500 mentioned above, no part of the $65,000 paid to him by William Lasdon was retained by petitioner for his own use.

Petitioner filed his income tax return for 1948 on April 11, 1949, having previously requested an extension of time within which to file it. The return disclosed gross receipts from his law practice in the total amount of $31,198.64. Included in this amount was the $17,500 which petitioner had recorded in his books as a fee from William S. Lasdon. Petitioner did not include in his return any of the remaining portion of the $65,000 received by him from William S. Lasdon. Petitioner's return showed net income in the amount of $8,868.69; tax liability thereon in the amount of $1,785.19; payments on his declaration of estimated tax for 1948 in the amount of $1,850; and an overpayment in income taxes in the amount of $64.81.

The statutory notice of deficiency was mailed on May 12, 1955, and there have been no waivers extending the statute of limitations.

Petitioner did not file a false or fraudulent income tax return with intent to evade tax for the year 1948.

OPINION.

The principal question involved in this proceeding is whether the entire $65,000 received by petitioner from William S. Lasdon is includible in his taxable income for 1948. Respondent contends that the entire amount represents earnings received by petitioner for services performed by him in obtaining a tax ruling favorable to William S. Lasdon and members of his family, and, accordingly, is taxable to

petitioner, citing *Helvering* v. *Horst*, 311 U.S. 112. It is petitioner's position, however, that only $17,500 of the $65,000 was a legal fee for his services and that of the remainder $30,000 was a political contribution by Lasdon and $17,500 represents income earned by Markus and Solomon.

The resolution of this question is not without considerable difficulty. As our findings indicate, we have for the most part accepted as true petitioner's testimony regarding the transactions that occurred between petitioner, Markus, Solomon, and the Lasdons. In so doing little credence has been given to the testimony of either Lasdon or Solomon. Unfortunately their testimony was presented by way of depositions and we were thus deprived of an opportunity to observe their demeanor on the stand, an important consideration, especially where the credibility of the witness is concerned. 3 Wigmore, Evidence, sec. 799 (3d ed., 1940). We have, nevertheless, carefully examined the transcript of their testimony and find it unconvincing. Without undertaking a complete analysis, it is sufficient to note that Lasdon repeatedly denied knowledge of petitioner's political connections, notwithstanding the testimony of both petitioner and Solomon that petitioner's political connections were discussed with both Milton and William S. Lasdon prior to petitioner's engagement. Moreover, the inference is inescapable that petitioner was employed because of his presumed political influence. Lasdon already had other competent tax counsel and obviously considered political influence necessary to obtain action on the application which his counsel had filed and which had been pending some 9 months or more. Lasdon also denied any political contribution was discussed or intended. Nevertheless, it is to be noted that though he claimed a deduction on his tax return for legal fees paid to Cann, he claimed no such deduction for the alleged legal fees paid to petitioner, nor did he file any information return advising the Bureau of Internal Revenue that he had paid a $65,000 fee for legal services to petitioner in 1948. See sec. 147, I.R.C. 1939. Such action is more consistent with the belief that the entire payment was intended as a nondeductible political contribution with petitioner as the conduit, than with the belief that it represented merely the payment of a fee for legal services rendered. Solomon's testimony is equally unconvincing. Not only did he assume an offended attitude on cross-examination by petitioner, but his answers were obviously evasive, being mostly "I don't remember," or "I don't recall."

It is to be noted that neither party produced testimony of Markus, Milton Lasdon, or Cann, though each of the parties had a definite burden to sustain.

Nor do we find the depositions of the chairman of the National Finance Committee and of the various employees of the Democratic

National Committee assigned to his office, taken on behalf of the respondent, of material assistance in determining whether the $65,000 paid to petitioner by Lasdon, or any part of it, represented or was intended as a political contribution on the part of William S. Lasdon. Apparently offered for the purpose of refuting petitioner's testimony as to the manner in which the $30,000 was turned over to the Democratic National Committee, it does little more than to demonstrate that the witnesses, including the aforesaid chairman, had no specific recollection in December 1957 of the transaction alleged to have taken place in 1948 during the heat of a presidential campaign. Respondent, on brief, concedes that the $30,000 was not retained by petitioner but was funneled into the Democratic National Committee by petitioner through the use of "dummy" contributors.

Again, we point out that we had no opportunity to, and did not, observe the witnesses on the stand when testifying. A bare reading of the transcript leaves us with the definite feeling not all of the witnesses were telling "the truth, the whole truth, and nothing but the truth." On the other hand, we did observe the petitioner and were impressed with his sincerity while testifying or otherwise addressing the Court. We also take note of the testimony of two judges of the District Court of the United States for the Southern District of California, and of the Referee in Bankruptcy for said District, to the effect that the general reputation of the petitioner for "honesty and integrity, truth and veracity" is excellent.

Whether the $30,000 was turned over to the Democratic National Committee in one lump sum or funneled into it through a number of individuals or local political committees is unimportant for the purposes of this case except as it might tend to impeach petitioner and lend support to respondent's contention that petitioner knowingly and willfully failed to report the entire $65,000 as income and accordingly filed a false or fraudulent return with intent to evade tax.

Having found the facts substantially as petitioner has related them, however, it does not necessarily follow that the entire $65,000, or at least the $30,000 which he caused to be contributed to the Democratic National Committee, as well as the $17,500 retained by him, does not represent the fruits of his labor and as such are not includible in his taxable income. See *Helvering* v. *Horst, supra; Lucas* v. *Earl*, 281 U.S. 111; *Burnet* v. *Leininger*, 285 U.S. 136. Under the circumstances, however, we find it unnecessary to make a final determination of this question.

Assuming, for the purposes of this case only and without making any final determination thereof, that the entire $65,000 is includible, as a matter of law, in petitioner's taxable income, the assessment and collection of the deficiency and additions to tax resulting therefrom, are barred by the 3-year period of limitations provided by section

974

275(a) of the Internal Revenue Code of 1939, *unless* it is also established that the return filed by petitioner for the year 1948 was false or fraudulent with intent to evade tax, as provided by section 276(a) of said Code.

The burden of proof with respect to fraud is upon the respondent. Sec. 112, I.R.C. 1939. A charge of fraud is never to be presumed, but must be established by respondent by clear and convincing evidence. *Henry S. Kerbaugh*, 29 B.T.A. 1014, affd. 74 F. 2d 749; *Arlette Coat Co.*, 14 T.C. 751; *W. A. Shaw*, 27 T.C. 561, affd. 252 F. 2d 681.

An essential element to the establishment of fraud, under section 276(a) and section 293(b), is that of "intent to evade tax," described in *E. S. Iley*, 19 T.C. 631, 635, as "the intent to defraud the Government by calculated tax evasions," and in *Mitchell* v. *Commissioner*, 118 F. 2d 308, 310, reversing 40 B.T.A. 424, as "the specific purpose to evade a tax believed to be owing." The question of intention is a factual one to be resolved from a consideration of the entire record. *M. Rea Gano*, 19 B.T.A. 518; *E. S. Iley, supra.*

We have found as a fact that petitioner did not file a false or fraudulent income tax return with intent to evade tax for the year 1948. We think the evidence presented herein permits of no other conclusion. Although petitioner may have been mistaken as to the legal consequences of the transactions we are satisfied he had no intention of evading a tax believed to be owing. A mistake of law, if it was a mistake, is not equivalent to the fraud with intent to evade tax named in the statute. Accordingly, we hold that the assessment and collection of the deficiency and additions to tax for the year 1948 are barred by limitations. Our determination with respect to this issue also disposes of the other issues.

*Decision will be entered for the petitioner.*