James T. Thrower and Jane P. Thrower v. Commissioner.
Thrower v. Commissioner
Docket Nos. 76715, 89111, 89112.
United States Tax Court
T.C. Memo 1962-291; 1962 Tax Ct. Memo LEXIS 17; 21 T.C.M. (CCH) 1540; T.C.M. (RIA) 62291; December 11, 1962
Edward S. Smith, Esq., Richard S. Doyle, Esq., and Stanley Worth, Esq., for the petitioners. Wallace W. Wright, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in income tax and additions to tax: Additions to Tax
Docket
Income Tax
Sec. 293(b)
Sec. 294(d)(2)
Sec. 6653(b)
Number
Year
Deficiency
1939 Code
1939 Code
1954 Code
89112
1951
$10,212.60
$ 7,111.22
76715
1952
13,231.40
13,374.66
76715
1954
11,433.74
$1,087.40
$5,716.87
89111
1953
15,939.82
7,969.91
89111
1955
1,891.87
945.94
*18 In his answer filed in Docket No. 76715, respondent claimed increased deficiencies as follows: Additions to Tax
Income Tax
Sec. 293(b)
Sec. 294(d)(2)
Sec. 6653(b)
Year
Deficiency
1939 Code
1939 Code
1954 Code
1952
$3,096.38
$1,548.19
1954
2,659.94
$159.59
$1,329.97
The issues remaining for our decision are: 1. Whether commissions nominally paid by certain distilleries to persons designated by the husband-petitioner, but actually controlled by said petitioner, are taxable income of said petitioner; 2. Whether one-third or any other portion of the alcoholic beverages sent by distilleries without charge to the Alabama Alcoholic Beverages Control Board (of which the husband-petitioner was one of the three members) constitutes taxable income to such petitioner; 3. Whether the amounts received by the husband-petitioner as reimbursement of travel expenses from the State of Alabama were in excess of his actual expenses and hence taxable income to him; 4. Whether the husband-petitioner incurred ordinary and necessary travel and entertainment expenses in the production of income from various business enterprises; 5. Whether any *19 part of the deficiencies for each year was due to fraud with intent to evade tax; 6. Whether assessment of deficiencies for the years 1951 and 1952 is barred by the statute of limitations; and 7. Whether petitioners are liable for an addition to tax for substantial underestimation of tax for the year 1954. Findings of Fact Some of the facts have been stipulated and are so found. The petitioners herein are husband and wife whose residence, at all times pertinent to these cases, was in Dothan, Alabama. Petitioners filed joint income tax returns for the taxable years 1951 to 1955, inclusive, with the district director of internal revenue for the district of Alabama, Birmingham, Alabama, and paid the taxes shown to be due on those returns. James T. Thrower will sometimes hereinafter be referred to as "petitioner" and Jane P. Thrower will be referred to as "Jane." Petitioner is a graduate of the University of Alabama, having received a degree of B.S. in business administration and an LL.B. degree from that university. He is an attorney at law and a member of the bar of the State of Alabama, although he has not actively engaged in the practice of law. Petitioner has prepared *20 the Federal income tax returns of several of the employees in the various business enterprises of petitioner and Jane described below. He did not prepare income tax returns of non-employees and received no fee for those returns he did prepare. Petitioner is also (and during the years at issue was) a merchant, and employed as manager of E. R. Porter Hardware Company, a partnership owned one-half by Jane and one-half by Jane's mother. Petitioner received salaries for such services which were duly reported. He further served as general manager of Porter Investment Company (a partnership in which Jane was a 70 percent partner and her mother a 30 percent partner) which operated a series of farms in the vicinity of Dothan, and of Porter, Gellerstedt and Thrower, a partnership which leased commercial and residential property. He was also executor of the estate of E. R. Porter, Jane's father, in which Jane had a one-half interest. The books of these several enterprises were audited by a certified public accountant who also prepared petitioners' income tax returns for all the years in issue. The income figures of petitioners from these enterprises were thus known to the accountant and duly *21 recorded by him on petitioners' returns. Petitioners' income from the above described sources was duly reported and is not here at issue. This income, especially the income from the Porter estate, [1] constituted the bulk of petitioners' reported income. Their only other reported income (apart from that on the rental property described below) was the compensation from the City of Dothan and the interest and dividends described in the next two paragraphs. Petitioner has for some time been active in local politics. In 1950, he was campaign manager in southeastern Alabama for Gordon Persons. Persons was elected Governor of Alabama in which post he served from January 1951 to January 1955. With the exception of the period October 1956 to October 1959, petitioner has since 1948 continuously served as mayor or as one of the three city commissioners of the City of Dothan. The compensation earned in these capacities was regularly reported. Petitioners also earned and reported the following interest and dividends
Year Dividends Interest Total 1951 $ 600 $ 359.46 $ 959.46
1952 900 618.44 *22 1,518.44
1953 1,008 1,017.41 2,025.41 1954 958 1,478.69 2,436.69
1955 4,860 1,234.34 6,094.34 On June 3, 1960, petitioner was convicted upon a plea of nolo contendere of conspiring to wilfully attempt to evade and defeat a large part of the income taxes due and owing to the United States and of filing false and fraudulent income tax returns for the years 1951 and 1952. Rental Property Jane and the E. R. Porter estate each owned a one-half interest in a rental property in Dothan. For the years 1951 and 1952 the gross rental on such property was $150 per month and Jane's share ( $900 per year less corresponding expenses) was correctly reported. In July 1953, petitioner, as representative of Jane and the Porter estate, negotiated a lease under which the monthly rental was increased to $200. Such increased rentals were paid from August 1953 through December 1955, inclusive. Jane always received one-half of said amounts. When the accountant prepared petitioners' returns for the years 1953, 1954, and 1955, petitioner informed him that the rentals on the above property were the same as in previous years. Accordingly, the accountant reported $900 gross rentals in 1953 and again *23 in 1954. No rentals were reported in 1955. [2]
Director's Fees, Interest and Dividends In all pertinent years, petitioner was director of both a bank and a savings and loan association in Dothan. As such he received the following fees, all of which were not reported on petitioners' income tax returns: Dothan Federal
Dothan Bank
Savings and
Year
and Trust Co.
Loan Assn.
1951
$60.00
$165.00
1952
45.00
190.00
1953
50.00
192.50
1954
60.00
192.50
1955
60.00
237.50
Petitioners also regularly failed to report the following amounts of interest on a savings account in Jane's name: Year
Amount
1951
$261.15
1952
353.88
1953
361.00
1954
368.25
1955
449.46
Petitioner owned preferred stock in Hedstrom Union Company from which he received the following dividends, all of which were unreported: Year
Amount
1951
$60.00
1952
60.00
1953
60.00
1954
52.00
1955
52.00
*24 None of the above-omitted amounts of fees, interest or dividends were supplied to the certified public accountant who (except for figures obtained from books of E. R. Porter estate, Porter Investment Company and the Porter, Gellerstedt and Thrower partnership) prepared petitioners' returns on the basis of figures furnished by petitioner. Travel and Entertainment It was necessary for petitioner to do small amounts of traveling on behalf of Porter Investment Company to handle matters relating to the various farms owned by that company. Likewise, petitioner had to travel a little on behalf of Porter Hardware Company. In thewe travels petitioner used his own car and was not reimbursed. Such expenses totaled $250 per year for each of the years in issue. Reimbursed Travel ExpenseAlabama Alcoholic Beverages Control Board Petitioner was appointed by the governor (Persons) of Alabama and served from January 25, 1951, through January 14, 1955, as a member of the Alcoholic Beverages Control Board for the State of Alabama (hereinafter referred to as "ABC"). The headquarters of the ABC was in Montgomery, Alabama, which is 125 miles from Dothan, Alabama. By automobile the traveling *25 time is approximately 2 1/2 hours. Petitioner served in this position without formal compensation throughout the Persons' administration and resigned therefrom at the end of that administration. The other two members of the ABC were W. K. Thames and Maury McWilliams. As a member of the ABC petitioner was entitled to an allowance for expenses provided by Alabama law for members of certain boards while engaged in the performance of their duties. Relevant portions of Alabama law provide: Section 3. Each member of the ABC Board shall be entitled to receive * * * an allowance for expenses for official travel in State, not to exceed $10.00 for each day he is entitled to compensation, and the actual cost of his transportation and no more; in the event he uses a privately-owned automobile for official travel, he shall receive six cents per mile for each mile actually travelled in attending board meetings or performing his official duties. * * * The law also provides that such reimbursement may not be for a period of more than 100 days in any year. ABC meetings were held once a week in Montgomery, to discuss policy. They started at 10:30 a.m. and usually terminated by midafternoon or *26 earlier. It was petitioner's custom to come to Montgomery on the morning of the meetings via automobile or his privately owned airplane and to return to Dothan later the same day. Petitioner made one trip to Phenix City, Alabama (in 1951), on behalf of the board. For such trip he claimed expenses of $17.29 and received reimbursement therefor. Apart from this isolated instance, petitioner never did any investigative work for the ABC. Rather, his work was confined to attendance at ABC meetings. Policy matters were never discussed outside of ABC meetings. Petitioner was rarely, if ever, at ABC offices on other than meeting days. On several occasions, petitioner went to Montgomery but did not attend ABC meetings. During the taxable years 1951 to 1955, inclusive, petitioner signed and submitted vouchers to the Department of Finance of the State of Alabama claiming expenses incurred as a member of the ABC and the amounts claimed on these vouchers were paid to him by the State of Alabama. The payments were made as a matter of routine with only a superficial audit. The number of round trips (Montgomery to Dothan) for which petitioner claimed and received reimbursement and the number *27 of ABC meetings attended by petitioner (per minutes) were: Number
Number
of
of ABC
Round
Meetings
Year
Trips
Attended
1951
67
42
1952
97
43
1953
94
35
1954
102
37
1955
4
2
364
159
In almost every instance petitioner sought and received the maximum $25 per day reimbursement for subsistence and mileage. Petitioner also claimed and received reimbursement for out-of-state travel (after advance approval of the governor) as follows: Date Claimed
Place
Amount
July 6, 1951
New York, New York
$517.71
Oct. 16, 1951
Seattle, Washington
518.10
Apr. 16, 1952
New Orleans, Louisiana
149.43
Dec. 10, 1952
Miami, Florida
286.61
The total reimbursements received by petitioner were as follows: Year
Amount
1951
$3,017.35 *
1952
2,861.04 **
1953
2,300.00
1954
2,475.00
1955
300.00
The portions of the above amounts considered by respondent to represent proper reimbursement and hence not taxable income and the balances which respondent added to taxable income *28 are as follows: Amounts
Balance
for Proper *
Included
Year
Expenses
in Income
1951 $630
$1,176.54
1952
645
1,955.00
1953
525
1,775.00
1954
555
1,920.00
1955
30
270.00
Petitioner received the following amounts of taxable income from reimbursed expenses in excess of allowable deductions: Year
Amount
1951
$1,159.25 (Trip to Phenix
City allowed.)
1952
1,955.00
1953
1,775.00
1954
1,920.00
1955
270.00
None of the above amounts were included in petitioner's income. Petitioner's certified public accountant specifically advised him that reimbursement in excess of actual expenses advised him that reimbursement in excess of actual expenses constituted taxable income but petitioner advised the accountant that there was no such excess. Commissions from Distilleries Under the laws of the State of Alabama, all alcoholic beverages shipped into that State by distilleries must be delivered to the central warehouse of the ABC at Montgomery. Each sales representative of a distillery is required by law to purchase *29 an Alabama license from the ABC annually and to submit an annual affidavit setting forth the amount of commissions and/or expenses received by him from the distillery. Distilleries are required to purchase an Alabama license from the ABC annually and to submit affidavits setting forth the amount of their sales to the State and the names and amounts paid to their representatives. It was the custom for distilleries to appoint a licensed agent to make sales in Alabama. Petitioner, by virtue of his position with the ABC, frequently "recommended" parties to distilleries to serve as their agents. These "recommendations" were always followed by the distilleries as a practical expedient in order to make certain that their products would be listed and ordered by the ABC. In 1951 petitioner recommended Dan Sallas, [3] a long-time employee on a farm owned by Porter Investment Company and located 6 miles southeast of Dothan, as an "agent" for Berke Brothers Distilleries, Inc. Berke Bros. appointed him on petitioner's recommendation. Sallas had very little education and was completely subordinate to petitioner who handled all his financial affairs. Sallas served strictly as an "armchair agent, *30 " i.e., he performed absolutely no services for Berke Bros. Sallas' application for employment listed his address as "Ariton, Alabama." Ariton is 38 miles north of Dothan. Sallas served as "agent" only during 1951. Also, in 1951, petitioner recommended S. E. Gellerstedt, the son of the Mrs. Gellerstedt who was associated with petitioners in the above-described real estate partnership, as "agent" for both Berke Bros. and Taylor Wine Company. Gellerstedt performed only very nominal services for either of these distilleries. He served as "agent" of the above companies for both 1951 and 1952. Both Sallas and Gellerstedt were approached by petitioner to serve as "agents." All checks drawn by Berke Bros. to "Dan Sallis" during the year 1951 were addressed to "Dan Sallis" at either the post office box rented to Porter Investment *31 Company, or the one rented to E. R. Porter Hardware Company at Dothan, Alabama, and from there they were delivered to petitioner. These checks were then deposited in an account in the name of "Dan Sallis" in the Headland National Bank, Headland, Alabama, by petitioner. Each check was in the amount of $300 and each was endorsed "Dan Sallis" by petitioner. The total amount of checks thus received by petitioner was $4,200 of which $4,075 [4] was deposited to the "Sallis" account and $125 was taken in cash by petitioner and used to pay miscellaneous expenses of Sallas. Deposits to and withdrawals from the account were made only by petitioner and Sallas had no knowledge of the existence of such account. Petitioner made the following withdrawals from the Sallas account: Date
Amount
July 21, 1951
$1,000
Sept. 4, 1951
1,000
Jan. 11, 1952
2,075 (Account
closed)
In 1952, petitioner prepared a personal Federal income tax return in the name of "Dan Sallis, c/o P.O. Box 236 [the Porter Investment Company box], Dothan, Alabama." The return reported salary from Berke *32 Bros. of $4,200 "less expenses not compensated for incurred for employer's benefit $407.50." These latter expenses were based exclusively upon petitioner's own "estimates." It showed a tax due of $325.65 which was paid by petitioner. Petitioner signed the return in the name of "Dan Sallis" without any indication that he was signing on behalf of Sallas. The name was signed in darker ink and in a different handwriting than that which was used to prepare the body of the return. All checks payable to Gellerstedt were mailed to Gellerstedt and (with minor exceptions hereinafter discussed) were endorsed by him to petitioner in accordance with a previous understanding with petitioner. The checks were then turned over to petitioner in Montgomery where Gellerstedt operated a tractor business. Four checks had not been endorsed by Gellerstedt and so petitioner endorsed them in Gellerstedt's name. The total amount of checks made payable to Gellerstedt were: Distillery
1951
1952
Total
Taylor Wine Co.
$1,475.00
$ 1,025.00
$ 2,500.00
Berke Bros.
4,597.50
18,952.50
23,550.00
Total
$6,072.50
$19,977.50
$26,050.00 Of the above amounts, the following were deposited *33 in Headland National Bank: Year
Amount
1951
$ 4,506.25
1952
10,131.25
The account was opened in September 1951, was closed by a withdrawal on January 11, 1952, and then re-opened on February 1, 1952. The 1952 account was closed by a withdrawal on October 21, 1952. All withdrawals from the account were made by petitioner. Of the remainder of the moneys, $2,817.50 worth of checks was cashed by petitioner and $8,595 worth of checks was taken by Gellerstedt as "ad hoc" loans for use in his tractor business which was having financial difficulties. It had been agreed between petitioner and Gellerstedt that the latter would report the above commissions on his Federal income tax return and petitioner would lend Gellerstedt the money if he were short when his taxes fell due. Petitioner's certified public accountant prepared a 1951 Federal income tax return for Gellerstedt which showed commissions of $9,238.75 offset by a business loss of $2,483.39. It showed a net tax due of $628.28. The return was never filed. No 1952 return was filed prior to 1957. Early in 1957, agents of respondent commenced an investigation of Gellerstedt's tax affairs. Gellerstedt then approached *34 petitioner for a loan which petitioner made to him. Petitioner suggested that Gellerstedt not volunteer any information to respondent's agents concerning the abovedescribed arrangement with respect to Federal income taxes. Petitioner further told Gellerstedt to postpone any further discussion with respondent's agents until petitioner arrived in Montgomery. On June 3, 1960, Gellerstedt was convicted, upon a plea of nolo contendere, of conspiracy to defraud the United States Government with respect to the income taxes of petitioner. On March 13, 1957, petitioner was contacted for the first time by a special agent of respondent. On that occasion the agent questioned petitioner on several subjects, including his receipt of moneys from Gellerstedt. Petitioner there unequivocally denied ever having received any commission moneys from Gellerstedt. Petitioner received taxable commission income from distilleries in the following amounts: Year
Amount
1951
$ 9,672.50
1952
19,977.50 None of these commissions were reported on petitioners' returns as originally filed for 1951 and 1952. Amended 1951 and 1952 returns were filed on June 18, 1957. These returns reported as *35 commission income the exact amount of the checks received by Gellerstedt in these years. At the time of preparation of the original 1951 and 1952 returns petitioner was specifically advised that commission moneys received as "political contributions" [5] but diverted to his own personal use constituted taxable income to the extent so diverted. He was also advised that campaign contributions were not deductible expenses. Free Beverages Alabama is a "monopoly" State, therefore distillers can sell liquor there only upon receiving orders from the ABC. In order to sell their products in Alabama, distilleries first must be "listed" by the ABC. The ABC also has authority to determine the wholesale and retail price of liquor sold in Alabama. [6] During the Persons' administration (January 1951 - January 1955), various officials of that administration decided that they could coerce "samples" from the various distillers as a "price" for continued orders. Accordingly, "samples" were "requested" from *36 the various distilleries. These "samples" were sent to the ABC warehouse, generally marked "for analytical purposes" and addressed to the attention of the career administration of the ABC. They were accompanied by invoices marked "no charge." The ABC copies of such invoices were immediately destroyed. The liquor thus received was dispensed according to instructions from "spokesmen for the administration." The employees of the ABC were generally instructed by Thames on this subject. The incoming "samples" were stored at the ABC warehouse. The prearranged plan for distribution of the free liquor permitted various State officials outside the ABC, principally the State legislators, to receive cases of liquor upon request for their own purposes. Some of the remaining liquor was given to various civic organizations for use at social functions and to subordinate employees of the ABC. Although the term of office of an ABC member is 6 years, members serve only at the pleasure of the governor. After the above-described distributions of free liquor, the remainder was divided five ways among the three ABC members, the career administrator of the ABC, and the governor. Petitioner received *37 only a one-fifth share of such remaining liquor. Such division occurred approximately once per month. An average of more than $55,000 worth of free liquor was received by the ABC (at retail prices and exclusive of amounts sent to and received by distillery representatives) during each of the years 1951 through 1954. These amounts varied from almost $35,000 to over $79,000 per year. The value of the free beverages which petitioner personally received was $3,500 in 1951, $7,500 in 1953, and $6,000 in 1952 and again in 1954. Estimated Tax On March 15, 1954, petitioners filed a declaration of estimated tax for the taxable year 1954 showing an amount of $4,000 estimated income tax for 1954. In January 1955, petitioners filed an amended declaration for the same year. By such amended declaration the estimated tax for the year 1954 was increased to $17,500. The amended declaration was received (with remittance) in the office of the district director of internal revenue in Birmingham, Alabama, on January 17, 1955. The total amount withheld on wages paid to petitioners in 1954 was $1,438.60. The total tax shown on the face of petitioners' 1954 income tax returns was $24,128.16. *38 Statute of Limitations The following waivers (Form 872) have been executed by petitioners, consenting to extend the statutory period for the assessment of taxes for the years given as follows: Date (Waivers)
Statutory Period
Taxable
Year
Filed
Extended To
Remarks
1952
Mar. 14, 1958
June 30, 1958
Effective only as to sec. 275(c), #i.r.c./ of 1939. [7]
1953
Mar. 11, 1959
Dec. 31, 1959
Effective only as to sec. 275(c), I.R.C. of 1939. [7]
Dec. 11, 1959
June 30, 1960
Effective only as to sec. 275(c), I.R.C. of 1939. [7]
1954
Mar. 11, 1958
June 30, 1958
1955
Mar. 11, 1959
Dec. 31, 1959
Dec. 21, 1959
June 30, 1960
Ultimate Fact Part of the deficiency in tax for each of the years 1951-1955, inclusive, *39 was due to the filing of false and fraudulent returns with the intent to evade tax. Opinion Issue 1. Travel and Entertainment Petitioner's evidence on this point is very general, amounting to little more than his own testimony to the effect that these expenses were incurred. While, as hereinafter discussed, we do not find his testimony to be trustworthy as a whole, we do believe that petitioner did incur some traveling costs in supervising the various farms owned by Porter Investment Company. In making our findings which are dispositive of this issue, we have borne heavily against petitioner as the inexactitude is of his own making, and have used our own best judgment to ascertain the amount of expenses so incurred. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Issue 2. Reimbursed Travel Expense - ABC Petitioner does not deny that he received the amounts indicated in our findings as reimbursement for traveling expenses from the ABC. He contends, however, that such amounts are equaled by the actual expenses incurred on ABC business and that, accordingly, none of the above amounts are includable in income. The issue thus presented is entirely factual and, *40 of course, petitioner bears the burden of proof. At the outset, we note that petitioner chose to offer no proof upon this issue at trial but indicated a preference to rely upon the stipulated facts. [8] All that the stipulation reveals is the number of round trips (Dothan to Montgomery) and the dollar amounts for which petitioner claimed and received reimbursement. It then shows that on only 159 out of 364 round trips did petitioner attend ABC meetings and further shows that petitioner claimed and received reimbursement for several other trips. We fail to perceive how such a stipulation proves that all such trips (and the amounts claimed therein) were on and in connection with ABC business. Quite to the contrary, absent any other facts (and petitioner has chosen to introduce none) we must logically assume that those trips which were not undertaken to attend ABC meetings were personal in nature. [9]
*41 Petitioner contends, however, that since all the above claims were submitted on vouchers which were "approved" by the State of Alabama, there is a "presumption of regularity," i.e., that Alabama would not have paid such vouchers were they not validly incurred in connection with ABC business. Petitioner cites no authority for this rather unique argument and we believe that none exists. It is a fundamental principle of tax law that mere book entries do not substantiate the truth of items there entered. Doyle v. Mitchell Brothers Co., 247 U.S. 179 (1918); Anthony Delsanter, 28 T.C. 845, 857 (1957), affd., 267 F. 2d 39 (C.A. 6, 1959). To begin with, the approval by the State is rank hearsay as to the business purpose of the expenditures reimbursed. Furthermore, there is considerable credible testimony that the vouchers were merely "rubberstamped" without any question. In the face of such evidence, it would take an exceptionally gullible finder-of-fact to believe that State "approval" demonstrates the business purpose of the trips. The doctrine for which petitioner appears to contend would permit wholesale "substantiation" of deductions by the *42 bootstrap technique of simply having vouchers marked "approved" by auditors. We cannot apply the presumption which petitioner here urges and we thus hold that he has failed his burden of proof. It follows that the amounts received other than as reimbursement for expenses incurred in actual attendance at ABC meetings and on the Phenix City trip (the only expenses shown to be deductible) are includable in income. Walter I. Geer, 28 T.C. 994, 997 (1957). There remains the question of the amount properly deductible on account of those 159 days on which petitioner actually attended ABC meetings. It is abundantly clear from the record that petitioner invariably went from Dothan to Montgomery in the morning of the same day that he attended ABC meetings in Montgomery. Indeed, the vast majority of petitioner's own vouchers do not seek subsistence allowance for the evenings preceding the meeting days but rather make such request for the evening of the meeting day. Since ABC meetings were generally concluded by early or midafternoon, it was certainly not necessary for petitioner to remain in Montgomery overnight after the meetings and, in any event, the record reveals that he *43 rarely did so. Likewise, there is a complete failure of proof that petitioner incurred any expenses for luncheon meals. Thus we need not decide whether a deduction would be allowable for such meals even though petitioner returned to his home on the same day he left it. Cf. Hanson v. Commissioner, 298 F. 2d 391 (C.A. 8, 1962). Respondent has eliminated from income the $15 per round trip (250 miles at 6 cents per mile) automobile expense reimbursement received by petitioner for attendance at ABC meetings. We do believe that petitioner's trip to Phenix City, Alabama, in 1951 was on ABC business and thus we believe that the reimbursement for this trip should not have been included in petitioners' income. With this exception, we sustain respondent's determinations on this issue. Issue 3. Sallas and Gellerstedt Commissions It is respondent's position that the commissions nominally paid to Sallas and Gellerstedt were actually the income of petitioner. The record leaves no doubt that Sallas and Gellerstedt were "agents" in name only and that they performed no real service for the distilleries they allegedly "represented." It places too great a strain upon our credulity *44 to believe that distilleries would pay such substantial sums in a business transaction to parties who performed no services for them. The much more likely inference from the record is that these sums were intended as compensation to petitioner to insure that they would remain in his good graces. If these monies were actually intended as compensation for Sallas and Gellerstedt we would expect that they would have exercised some control over the monies received. Yet, Sallas did not even physically handle the checks and had no knowledge of the existence of the account opened in his name. Rather, his checks went directly to petitioner, were endorsed by petitioner and deposited in an account which petitioner alone controlled as to withdrawals. While Gellerstedt handled some of the checks physically, he endorsed most of them over to petitioner pursuant to a prior understanding. Like Sallas, Gellerstedt had no knowledge of the account in his name and exercised no control whatsoever in regard to it. The practical enjoyment of these monies was thus given to petitioner. It is fundamental that income is taxable to the party who is able to direct and control it, irrespective of the form in *45 which payment is made. Corliss v. Bowers, 281 U.S. 376 (1930); Griffiths v. Commissioner, 308 U.S. 355 (1939). It is here appropriate to make the observation which Justice Holmes made in the Corliss case: (281 U.S. 378) But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid. * * * The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not. * * * Petitioner maintains, however, that he was a mere conduit for these monies which were all ultimately turned over intact to committees for various political campaigns in Alabama. Apparently, he portrays either the distilleries or Sallas and Gellerstedt as the other end of the conduit. Petitioner had no receipts for any of the above alleged contributions. To be sure, he did produce some corroborating testimony to establish that he turned monies over to the various campaign committees, but we find this testimony to be singularly unconvincing and contradictory (especially *46 that of Vernon Merritt, Executive Secretary to Governor Persons). [10] Furthermore, it accounts, at the most, for only about $15,000 out of better than $26,000 which petitioner received. The disposition of the remaining $11,000 is accounted for only by the testimony of petitioner which we find unworthy of belief. In any event, none of the above testimony establishes (or even purports to establish) that these monies were turned over to the various campaign committees by petitioner as trustee for either the distilleries or Sallas and Gellerstedt. To the contrary, the testimony of the *47 representatives of the distilleries and of Sallas and Gellerstedt expressly disavows any purpose to make political contributions as above described. Perhaps even more significant, the very witnesses who alleged receipt of these monies testified that there was absolutely no indication that petitioner was turning over these monies as trustee for others. The handling of the accounts at the bank gave no indication that these accounts were trustee accounts. Petitioner has completely failed to prove his status as trustee with respect to the commissions. Frederick S. Buggie, 32 B.T.A. 581, 586, and this being so all political credit and advantage for having made the contributions belonged to petitioner alone and inured to his sole advantage. Even taking the evidence in the light most favorable to petitioner the most that can be said is that he voluntarily chose to contribute part of the commissions he had received to the political committees. This in no way alters our conclusion that the commissions nominally paid to Sallas and Gellerstedt were income of petitioner and petitioners do not even attempt to argue that these contributions were deductible. Petitioners place reliance *48 upon our decision in Welburn Mayock, 32 T.C. 966 (1959). There are numerous distinctions between that case and the instant one. The most fundamental point, however, is that in Mayock we held only that taxpayer had not been guilty of fraud in failing to report a portion of his "fee" for services (in procuring a favorable income tax ruling) which portion was turned over to a political committee. As there was no fraud, the statute of limitations was applicable to bar assessment of deficiencies and thus we left open the question whether the total fee was taxpayer's income.[11]
We decide this issue for respondent. Issue 4. Free or Sample Alcoholic Beverages A. Taxability As is customary in cases with such strong political overtones, the record is unclear with respect to the origins and terms of the arrangement among *49 the various State officials regarding the receipt and disposition of free or sample alcoholic beverages. [12]
We strongly believe, however, that the beverages were sent because of the coercion, be it ever so subtle, exerted upon the distilleries to do so. It is quite clear from the record that the consequences of noncompliance would have been severe. It is certain that the quantities of free beverages received were greatly in excess of the ABC's legitimate needs (which were very nominal) for "analytical purposes." Indeed, the ABC's career administrator, called as petitioners' witness, testified on cross-examination: Q. Well, didn't you tell me at that time over in Montgomery also that none of these sample beverages were used for chemical analysis purposes? A. Yes, sir. Q. I think that we discussed that and the only test was applied was the "taste test"; isn't that right? A. That's right. * * *
Q. Well, now; how about other markings on cases; were they marked samples? A. In some instances *50 they were marked samples and had samples stamped on the bottles, and then sometimes they were sent in for analytical purposes - Q. They were sent in for analytical purposes and marked, "Analytical purposes?" A. Yes, sir; they were marked "Analytical purposes." Q. But you had no analytical function? A. No, sir; but they were marked that way. Moreover, we are very much impressed by the testimony of the distillery executives to the effect that in no other monopoly states were the quantities of "samples" anywhere near so great as in Alabama. While perhaps there is some doubt as to whether the ABC would be so audacious as to delist a company which failed to comply with a "request" for samples, it is very apparent to us that these "requests" were made in such a fashion as to leave no doubt in the minds of the distillery officials of the business necessity for compliance. As one very reliable executive stated it: Q. Why did you send these beverages? A. Well, I had one customer in Alabama, and I certainly didn't want to go against the wishes of the state. Q. That customer was the ABC Board? A. That's right. Q. What control did the Board have over your products? If *51 your products were selling then in the state, how could they affect the business you did in that state? A. Well, they could affect it in many ways. Q. Well, tell us a few. A. Well, No. 1, they could withhold the frequency of orders. They could affect our distribution in the stores. Those are the two main reasons. Q. They could affect your distribution in the stores? A. Yes, I mean by that, from the warehouse to the stores. They could either short our distribution. In other words, if a certain store was selling 20 cases a week, they could send 10; and that's all we could sell. Q. That would have a very definite effect upon your sales in that state? A. I'll say that's a possibility; yes. * * * Q. Did your company send any of these cases to the Alabama Board for motives of affection? A. No, sir. Q. Did you do it out of respect for the members of the Board? A. No, sir. Q. Did you do it out of admiration for the Board, or any member of it? A. No, sir. Q. Did you do it for purposes of charity? A. No, sir. It was for business reasons. Another very credible witness testified: Q. For what reason did your company make these shipments? A. We wanted to *52 stay on good terms with the ABC Board, and continue to do business. Q. Would you consider that your failure to send any of these samples might adversely affect your business in the State of Alabama? A. I had that feeling; yes. Yet another trustworthy witness testified: Q. Now I'm not sure what you said about the results of your stopping the shipment of samples. What were those results? A. I said the last shipment that we made was in December, '52, and it did not include any free samples. Consequently we received no additional orders after that time. The record is replete with testimony of this sort. The very enormity of the quantities shipped convinces us that the contention that these shipments were either "samples" or "gifts" (in any sense of the term) is preposterous. Certainly, the free beverages were not sent out for motives of "detached and disinterested generosity" or for reasons of "affection, respect, admiration, charity or like impulses." Accordingly, the free beverages did not constitute "gifts" in the sense that term is used in our revenue laws. Commissioner v. Duberstein, 363 U.S. 278 (1960), and cases there cited. Whether these shipments be termed *53 "bribes" or "inducements" or "rewards" it is manifest that they fell within the broad concept of income as that term is defined by the revenue statutes and cases thereunder. Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). B. Petitioner's Share Respondent determined that petitioner is taxable upon one-fourth of the above amounts, apparently on the theory that all the free beverages were divided among the three ABC members and the ABC career administrator. The increased deficiencies asserted via respondent's answer stem from his contention (as to years 1952 and 1954) that petitioner's share was actually one-third of the amount received as reduced by a small amount each year for the career administrator. We do not believe either of these fractions to be realistic. As we construe the rather confused record on this point, there were many other influential politicians who were entitled to, and received, a "cut" of the samples. Petitioner could be removed from his position at the whim and caprice of the governor; when Persons left office in early 1955 and the candidate whom petitioner supported (Owen) failed to obtain the Democratic nomination for governor, petitioner *54 "resigned." We entertain little doubt that such "resignation" was a practical concession to the political facts of life. It is thus apparent to us that we may not view the ABC members as independent personnel in the executive department of government, free to operate their department as they choose. In a very real sense, although of course not by virtue of any predetermined shares or formal agreement, these politicians (principally State legislators) were "partners" of the ABC members who could be certain that they would get their "cut." Clearly, all these "partners" had distinct personal and political purposes of their own to be served by handing out free liquor to their creditors or constituents. We are further convinced from the record that this "cut" came "off the top," i.e., before distribution of the residue among the ABC members. Since taxation is a matter of practical control over property, Griffiths v. Commissioner, supra, it is thus improper to tax petitioner upon more liquor than he actually got for his own purposes. The record is exceptionally vague as to the quantity petitioner actually received. All that we have are very rough "estimates" made by various *55 witnesses at the trial of this case, long after the events involved. No records of any kind were kept. We have therefore exercised our own best judgment in making our findings which are dispositive of the issue. Cohan v. Commissioner, supra.
Issue 5. Fraud Respondent has the burden to prove fraud by clear and convincing evidence. Powell v. Granquist, 252 F. 2d 56 (C.A. 9, 1958); W. A. Shaw, 27 T.C. 561, affd. 252 F. 2d 681 (C.A. 6, 1958); M. Rea Gano, 19 B.T.A. 518 (1930). Of course, innocent mistakes as to the proper tax treatment of given items or transactions do not constitute fraud. Rather, to establish fraud respondent must show an intentional, knowing omission of an item of income and knowledge on the part of the taxpayer that such item is properly includable. James v. United States, 366 U.S. 213 (1961); Spies v. United States, 317 U.S. 492 (1943); Welburn Mayock, supra.The existence or absence of such knowledge must be gleaned from the record as a whole. The knowledge may be inferred from certain affirmative acts of the taxpayer. Spies v. United States, supra. *56 We shall now analyze the various omissions which respondent contends constitute proof of fraud to see whether they indicate deliberate omissions with intent to evade tax. A. Unreported Commissions As regards the unreported commissions income in 1951 and 1952 petitioner took many positive steps inconsistent with the theory that he believed the commissions not taxable to him. Rather, these acts separately and together bespeak of a knowledge of taxability and a calculated effort to conceal the facts upon which such taxability might be determined. The use of the separate bank accounts in the names of parties intended to have no interest therein and the employment of "armchair agents" whom petitioner designated, the false address on the Sallas application and the agreement to pay Sallas' and Gellerstedt's taxes if necessary all point toward this conclusion. See Henry Naples, 32 T.C. 1090, 1096 (1959). Even more significant is the preparation by petitioner of the 1951 Sallas tax return and the signing thereof by petitioner in a manner conceived to make it appear that someone other than petitioner (i.e. Sallas) had signed the return. As if this were not enough, petitioner *57 then "estimated" expenses on the 1951 Sallas return so that not only were the commissions shifted from petitioner's high surtax bracket to Sallas' much lower one but also "Sallas'" taxes in that lower bracket were further reduced. Since Sallas performed no services whatsoever for Berke Bros. (as petitioner well knew) we find it impossible to understand how petitioner could have honestly believed that Sallas had incurred expenses of $407.50 (the only conceivable expense which Sallas could have paid was the $50 application fee to the ABC). The advance agreement to loan Gellerstedt money with which to pay his taxes and the "suggestions" to Gellerstedt that he postpone the audit of his tax affairs until petitioner reached Montgomery and that he not volunteer any information to respondent's agents are strong indicia of an intent to conceal. Stronger yet, are petitioner's deliberately false denials not only to his own accountant but also to respondent's special agent concerning his receipt of commission moneys from Gellerstedt. Abraham Galant, 26 T.C. 354, 365 (195 ); Madeline V. Smith, 32 T.C. 985, 987 (1959). B. Failure to Include Reimbursed Travel Expenses
*58 In all the years 1951-1955 petitioner submitted vouchers for traveling expenses allegedly incurred on behalf of the ABC. These vouchers were routinely paid, as petitioner could well expect since most of the "auditing" was done by parties subordinate to himself. In each year the amounts requested and received were well in excess of the actual expenditures. In several instances he claimed round-trip (Dothan to Montgomery) travel expenses for days when the minutes reveal he missed the scheduled ABC meetings. Only 159 out of the 364 claimed reimbursements were for days when petitioner actually attended ABC meetings. Invariably, petitioner claimed the maximum subsistence pay allowed ( $10 per day) including allowance for hotel rooms. This was done in spite of the fact that he rarely stayed overnight in Montgomery. We have studied petitioner's demeanor on the witness stand and believe him to be a shrewd and well-informed person. Taking into account his general evasiveness, and the manifest implausibility of much of his testimony, we are convinced that it is not worthy of belief. We thus cannot believe that petitioner failed to appreciate that these obviously excessive claims were a *59 means of securing additional funds from the State. [13] Petitioner specifically told his accountant that he had no reimbursed expenses in excess of costs even after he was advised by the accountant that such reimbursements constituted taxable income. Thus, the conclusion is inescapable that petitioner deliberately and consistently omitted from income amounts which he well knew were much in excess of his actual costs on behalf of his employer and which he further fully appreciated were required to be included in income. C. Other Omissions In each year 1951-1955 petitioner omitted director's fees from two different banks in Dothan. His excuse for such omission - that he felt that travel expenses incurred (but not claimed) on behalf of these employers were at least equal *60 to these fees - strikes us as an afterthought and is very difficult to accept. It is all the more implausible in view of the fact that in each pertinent return petitioner had already deducted liberal amounts (under the miscellaneous heading in the itemized deductions section of the returns) for "Travel and Entertainment Necessary to Production of Income Not Reimbursed." We thus cannot accept petitioner's explanation. As we said in M. Rea Gano, supra, at p. 533: A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose. Likewise, petitioner failed to advise the accountant in any of the years of the interest earned on Jane's savings account and of the dividends received on the Hedstrom Union preferred stock. Neither of these consistent "oversights" is explained. [14]
*61 Moreover, when his accountant was preparing petitioners' 1953-1955 returns, petitioner told him that the rents on the property owned one-half by Jane were "the same" (i.e., the same as in previous years). He made this statement despite the fact that he had negotiated the lease calling for the increased rental. We can hardly attribute such statements to inadvertence. The above-described omissions were consistent and reveal to us a pattern designed to conceal income. M. Rea Gano, supra; Arlette Coat Co., 14 T.C. 751 (1950). As we have already observed petitioner's testimony is exceptionally untrustworthy and in many instances manifestly improbable. Witness, particularly, his statement that he had "complete confidence" in his accountant and thus never troubled himself to check the returns. Considering petitioner's sagacity and the large amounts of tax involved this remark strikes us as utterly false. Nor, indeed, could the accountant have included the many figures which petitioner never furnished to him. We thus believe that petitioner knowingly omitted these items from his returns. While the amounts are, perhaps, not substantial in relation to the total *62 amounts reported, we must remember that the bulk of the reported amounts emanated from sources which were audited by the accountant and the figures were then taken directly from such sources in preparation of petitioners' returns. As to these sources, petitioner had no opportunity for omission. On the other hand, in comparison to the dividends and interest from other sources actually reported, the omissions are quite large. Nor can any of these omitted items be considered to have presented technical or difficult legal questions to petitioner who was a lawyer and, indeed, prepared some returns for others. All the above-described omissions (Parts A, B, and C) occurred in the years 1951 and 1952 and, collectively, they constitute clear and convincing evidence of fraud. There was no omission of commissions in the years 1953-1955 but nevertheless our above conclusions as to the purposeful and deliberate omissions of the various items (Parts B and C), together with petitioner's very unsatisfactory explanations thereof, convince us that such omissions were made with fraudulent intent. As there was fraud in 1951 and 1952, it follows that the statute of limitations upon assessment is inapplicable *63 for those years. Sec. 276(a), Internal Revenue Code of 1939. Issue 6. Estimated Tax Respondent determined an addition to tax under section 294(d)(2), [15] Internal Revenue Code of 1939, for the year 1954. At the trial of this proceeding petitioners made some effort to explain their underestimation. Whether or not this explanation constitutes "reasonable cause" is, however, completely beside the point. It is clear that this addition to tax is imposed solely on the basis of the underestimation and that the reason therefor is immaterial. H. R. Smith, 20 T.C. 663 (1953); Estate of Arthur Garfield Hays, 27 T.C. 358 (1956). Likewise, the time of payment of the estimated tax has no bearing on the amount of the 294(d)(2) addition and thus it is unimportant whether the amended declaration was "filed" (as opposed to received) on or before January 15, 1955, as petitioners contend. Since 80 per cent of the tax (even as reported on the 1954 return) exceeds the estimated tax, the addition to tax under 294(d)(2) is proper. The amount can be computed under Rule 50. *64 Decisions will be entered under Rule 50. Footnotes
1. Jane's income from this source alone averaged about $45,000 during the years at issue.↩
2. Petitioner does not challenge respondent's addition to income of the following amounts (net) based upon the rental omissions: 1953
$212.50
1954
300.00
1955
998.18
The sole relevance of the rental income omissions, therefore, is in regard to the fraud issue.↩
*. Respondent seeks to have only $1,806.54 included in income. ↩
**. Respondent seeks to have only $2,600 included in income.↩
*. Computed on the basis of $15 per trip (250 miles at 6 cents per mile) on round trips for ABC business.↩
3. On the application filed with Berke Brothers Distilleries, Inc., and in all other documents pertaining to Sallas' position with Berke Bros. (including the checks, bank account and tax return hereinafter described), petitioner spelled Sallas' name "Sallis." For convenience, however, we shall hereinafter refer to this party as Sallas except as otherwise noted.↩
4. Respondent has charged only $3,600 of this amount to petitioner. The difference is unexplained.↩
5. This is petitioner's contention, discussed infra, as to the reason Sallas' and Gellerstedt's commission checks were given to him.↩
6. Title 29, Code of Alabama, sec. 5 (1940).↩
7. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. (c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
8. The following statement was made by one of petitioners' attorneys at trial: Q * * *: If it please the Court, the petitioner is introducing no evidence at this time on the issue of reimbursed expenses paid by the Alabama Alcoholic Beverage Control Board for the reason that the pleadings and the stipulation adequately cover that item. ↩
9. This conclusion is affirmatively supported by evidence in the record to the effect that petitioner had business unrelated to ABC matters to transact in Montgomery. Furthermore, various ABC employees and McWilliams testified that petitioner was rarely, if ever, at the ABC headquarters on other than ABC meeting days.↩
10. Petitioner also offers the affidavit of the Finance Director of the State of Alabama to the effect that petitioner gave him $5,000 for the Stevenson-Sparkman campaign in 1952. The parties are in disagreement concerning the admissibility of such affidavit. We do not decide this question because, assuming that it is admissible, we still do not place much credence upon it in the face of a very contradictory record and the weak testimony of petitioner concerning this contribution. In any event, it does not establish that petitioner gave the money as trustee rather than in his individual capacity.↩
11. The case was also stronger for taxpayer on the income issue than is the instant case. There was evidence in Mayock to support the inference that the payor of the fee thought he was making a contribution to a political campaign (through taxpayer as a conduit) and did not consider the entire amount paid to be a legal fee. (32 T.C. 972↩)
12. Our reference to these beverages as "free" is for convenience and does not imply that they were given for no consideration or that their receipt was not taxable income.↩
13. It is true that petitioner served on the ABC without receiving compensation as such. But we cannot draw any inference favorable to petitioner from this circumstance because the reason for such arrangement was simply (as petitioner himself explained) that the Alabama Constitution forbids a person from holding two public offices for profit at the same time and petitioner was already serving as mayor of Dothan.↩
14. As regards the omission of interest on Jane's savings account petitioner sought to explain such "oversight" as attributable to the circumstance that the account was completely inactive through all the years in issue and thus no notices were sent regarding additions of interest to it. However, the bank book was not introduced into evidence. Furthermore, the progressive increases in the annual amounts of interest are more than could possibly be attributable to the compounding of interest. Necessarily, it follows that petitioners were making additions to this account and petitioner's explanation of "inactivity" is exposed as a rather poor one.↩
15. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 per centum of the tax * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax * * *, whichever is the lesser. * * *↩