M. HUNTER BROWN v. COMMISSIONER
Brown v. Comm'r
No. 3387-65; No. 1971-66; No. 2209-66 United States Tax Court
1968 U.S. Tax Ct. LEXIS 200; 27 T.C.M. (CCH) 127; ax Ct. Mem. Dec. (CCH) 28,849(M); February 19, 1968, Decided *200 M. Hunter Brown, Pro se, Santa Monica, Calif.
Erwih L. Stuller and Michael Pargament, for the respondent. FEATHERSTON, Judge. FEATHERSTON
Memorandum Findings of Fact and Opinion
FEATHERSTON, Judge:
Respondent determined the following income tax deficiencies and additions to tax against the petitioner:
Additions to Tax
Sec.
6653(b)
Sec.
Year
Deficiency
n.1 6654(a)
1959
$ 12,851.35
$ 6,425.67
1960
4,822.39
2,411.19
$ 12.39
1961
1,922.01
961.00
The issues presented for decision are:
n.1 All section references are to the Internal Revenue Code of 1954, as amended.
(1) Whether it was proper for respondent to use the bank deposits method in determining petitioner's taxable income for 1959, 1960, and 1961.
(2) Whether respondent's calculations of taxable income under the bank deposits method were a reasonably accurate determination of petitioner's taxable income for the years in controversy.
(3) Whether petitioner's rights under the Fourth and *201 Fifth Amendments to the Constitution were violated through the issuance of summonses by respondent's agents for the examination of the records of the several banks with which petitioner had accounts and did business.
(4) Whether the statutory notices of deficiencies issued to petitioner were rendered null and void by the denial of district conferences for the tax year 1960 and failure to "complete" the conference for 1959.
(5) Whether respondent has proved fraud by petitioner so as to remove the bar of the statute of limitations for 1959 and 1960 under Code section 6501(c)(1) and support the imposition of the 50 percent penalty under Code section 6653(b) for 1959, 1960, and 1961.
(6) Whether petitioner is liable for an addition to tax for 1960 under Code section 6654(a).
Findings of Fact
M. Hunter Brown (herein called petitioner) was a legal resident of Los Angeles County, California, during the years 1959, 1960, and 1961 and at the time of filing the petitions herein. He was married to Martha Jane Brown during the years 1959, 1960, and 1961.
Petitioner filed separate Federal income tax returns for the years 1959, 1960, and and 1961 on the cash basis with the district director *202 of internal revenue, Los Angeles, California. Petitioner's return for 1959 was joint in form but it was actually a separate return. Deficiency notices for the years 1959, 1960, and 1961 were mailed to petitioner on the following dates:
Year
Date of Mailing
1959
February 11, 1966
1960
February 11, 1966
1961
April 15, 1965
Petitions were filed with the Tax Court in the names of petitioner and Martha Jane Brown as follows:
Year
Docket No.
M. Hunter Brown and Martha
1959
Jane Brown
2209-66
M. Hunter Brown and Martha
1960
Jane Brown
1971-66
1961
M. Hunter Brown
3387-65
Martha Jane Brown
3388-65
On September 18, 1967, following testimony by petitioner and his former wife, Martha Jane Kaestner, the Court entered the following order:
* * *
Whereas Martha Jane Kaestner appeared as a witness in open court on September 18, 1967, and testified that she was formerly the wife of Dr. M. Hunter Brown and was known as Martha Jane Brown, and that she did not sign, or authorize anyone else through a power of attorney or otherwise to sign, her name to said petitions or to take any other action on her behalf in respect of her Federal *203 income tax liability for the years 1959, 1960 and 1961;
Whereas the Court is convinced of the truthfulness of such testimony of Martha Jane Kaestner, and
Whereas the respondent has filed a Motion to Dismiss for Lack of Jurisdiction as to Martha Jane Brown and to Change Caption, it is
ORDERED
1. That Martha Jane Brown, and only Martha Jane Brown, be dismissed as a petitioner in Docket Nos. 1971-66 and 2209-66 for lack of jurisdiction, and
2. That the name Martha Jane Brown be stricken from the caption of Docket Nos. 1971-66 and 2209-66, and that hereafter the caption of these cases shall be: "M. Hunter Brown, Petitioner, v. Commissioner of Internal Revenue, Respondent, Dockets Nos. 1971-66 and 2209-66."
3. That Docket No. 3388-65 be dismissed for lack of jurisdiction.
Petitioner has been a practicing neurosurgeon in the greater Los Angeles area since 1949 and most of his income in the years 1959, 1960, and 1961 was derivedfrom the performance of professional services. His business records on his medical practice consisted of ledger cards for individual patients, maintained in alphabetical order in three separate file boxes. One box was for cards on patients whose treatments and *204 examinations had begun in a preceding year for which payments were received in the current year. The second box was for cards on patients for whom services were performed in the current year and whose bills were paid in full. The third box contained cards reflecting services performed for patients in the current year on which there remained a balance to be collected. Cards for patients for whom services had been performed in a prior year and for whom services were performed in a current year were removed from the file for the prior year, inserted in a current file and used as a record of current services. Petitioner used the totals of his patients' cards in compiling the information used in preparing his income tax returns.
Petitioner's tax return for 1957 was audited by Revenue Agent Sommers in 1959. At the completion of the audit in early November 1959, Sommers orally informed petitioner that his business records were inadequate. Sommers explained that the ledger cards were not satisfactory records because they could be lost, misplaced, misfiled, or removed from the boxes for a variety of reasons. He advised petitioner to keep a cash receipts journal in which he should record all *205 business receipts. On November 3, 1959, Sommers personally served a formal notice of inadequate records (Form Letter 7021) on petitioner which referred to Code sections 6001 and 7203 and various regulations on record keeping. Sommers orally informed petitioner that his future returns would be audited to see that he conformed to the request that he keep more adequate records.
Subsequent to the receipt of Form Letter 7021 from Revenue Agent Sommers, petitioner maintained a day book in which he recorded business and personal appointments and some daily receipts. Only petitioner's day book for 1961 was introduced in evidence. Petitioner's day book for 1961 shows 66 items of income totaling $ 7,030.50 which did not appear in the patient ledger cards for that year. Conversely, the patient cards for 1961 recorded 38 items totaling $ 1,656.38 that did not appear in the day book for 1961. The amount of business receipts reported in the 1961 returns filed in the names of petitioner and Martha Jane Brown was approximately the amount of the receipts shown in the 1961 day book.
Petitioner alone opened mail received from patients and prepared and made his bank deposits. He alone prepared the summaries *206 of income from his patients' ledger cards used in the preparation of his income tax returns. Petitioner purposely and with intent to evade and defeat tax omitted substantial amounts of taxable income from such ledger cards, summaries of income and his tax returns for 1960 and 1961.
Petitioner's returns for all three years in controversy were prepared by Lillie M. Purvis, an employee of a local accounting firm, from information in summary form supplied by petitioner. She never audited petitioner's records or verified the information supplied by petitioner.
Revenue Agent Long started an audit of petitioner's 1959 tax return on or about August 24, 1961. At that time petitioner informed the agent that his returns had been prepared from the information on the patient ledger cards. The amount of income shown on the cards did not reconcile with the amount shown on the return and Revenue Agent Long, upon making this discovery, asked to see petitioner's bank statements. Although Agent Long was given some canceled checks, he was not given petitioner's bank statements.
On or about the same date, August 24, 1961, Revenue Agent Long issued a summons to the Security First National Bank, Westwood *207 Village Branch, for examination of petitioner's bank ledger cards and signature cards for the period 1958 to 1960. On or about September 20, 1961, a summons was issued to Citizens National Bank, University -Westwood Office, for petitioner's bank deposit slips, net worth statements, ledger cards and any or all data related to petitioner's financial affairs for a three-year period ending December 31, 1960. On or about April 25, 1963, Special Agent Stringham served a summons on the Security First National Bank, Westwood Village Branch, for all documents relating to petitioner's financial affairs for the period 1957-1961. On the same date Special Agent Stringham served a similar summons on Citizens National Bank, University-Westwood Office, for financial data for the period 1957-1961. During the course of the investigation of petitioner's returns for 1959-1961, summonses were also issued to other banks and financial institutions. The records obtained through these summonses andother information obtained by the agents in the course of their investigations were used in their determination of petitioner's taxable income for the years 1959, 1960, and 1961 under the bank deposits method.
*208 An analysis of petitioner's bank accounts shows that total deposits and interest on deposits for the years here in controversy were as follows: [2]
Banks
1959
1960
1961
Security First National Bank, Westwood
$ 121,891.10
$ 19,007.00
$ 10,789.50
(checking)
Citizens National Bank (checking)
10,158.16
72,839.58
53,602.57
Citizens National Bank (savings)
29,015.22
7,122.56
12,015.81
Security Federal Savings & Loan
9,038.56
5,930.49
Association
Coast Federal Savings & Loan Association
4,915.84
Bank of America
Security First National Bank, Brentwood
500.00
Totals
$ 170,103.04
$ 98,969.14
$ 87,754.21
On December 31, 1960, petitioner deposited $ 1,156 with the Security First National Bank, Westwood Village. This deposit was recorded on the bank records *209 as a deposit on January 3, 1961. We find that the deposit was made in 1960 and have included it in the 1960 deposits rather than the 1961 deposits.
Each item of each deposit was examined by respondent's agents to determine if it was a possible non-income item or a non-business income item. All items not clearly income were eliminated from respondent's determinations of petitioner's income.
The following schedule shows all the non-income items deposited to petitioner's bank accounts during the years concerned.
1959
1960
1961
Transfers between accounts
$ 29,795.22
$ 11,781.26
$ 22,947.65
Redeposits
367.78
170.00
25.00
Loans deposited
33,000.00
2,000.00
-0-   Capital transactions
53,782.12
4,420.65
-0-   Nontaxable disability pension
3,036.60
3,036.60
3,036.60
Income and corpus distributions from
2,145.76
18,436.89
13,005.04
Estates
Total
$ 122,127.48
$ 39,845.40
$ 39,014.29
In the years here involved petitioner had the following cash business receipts and dividend income which were not deposited in bank accounts:
1959
1960
1961
Cash Business Receipts
$ 1,829.50
$ 2,581.05
$ 1,665.00
Dividends
902.40
750.27
715.62
Total gross receipts not deposited
$ 2,731.90
$ 3,331.32
$ 2,380.62
*210 The undeposited business receipts were disclosed in petitioner's statements to agents, examinations of patient cards reflecting receipts in cash, and comparisons of these receipts with bank records. The amounts of undeposited dividends were determined through a comparison of records of dividend payments with bank deposits.
Petitioner had the following amounts of Gross Ordinary Income Receipts:
1959
1960
1961
$ 50,707.46
$ 62,455.06
$ 51,120.54
These amounts were determined by subtracting non-income items from total bank deposits and adding to the remainder the total ordinary income not deposited.
Petitioner had the following amounts of non-business income:
1959
1960
1961
Dividend Income
$ 902.40
$ 750.27
$ 715.62
Interest Income
128.77
103.13
121.34
Total Non-business Income
$ 1,031.17
$ 853.40
$ 836.96
The dividend income, none of which was deposited, was determined in the manner described above. The interest income was determined from petitioner's stockbroker's records and from bank records.
Petitioner had the following Corrected Business Receipts determined by subtracting the non-business income from the Gross *211 Ordinary Income Receipts:
1959
1960
1961
$ 49,676.29
$ 61,601.66
$ 50,283.58
Petitioner had business receipts not reported in his income tax returns, computed as follows:
1959
1960
1961
Corrected Business Receipts
$ 49,676.29
$ 61,601.66
$ 50,283.58
Business Receipts per Returns
39,086.31
44,624.04
47,347.86
Unreported Business Receipts
$ 10,589.98
$ 16,977.62
$ 2,935.72
In each of these years, 1959, 1960, and 1961, petitioner filed with Citizens National Bank financial statements showing estimated annual business income of $ 50,000 per year.
One adjustment made in the notice of deficiency as to petitioner's return for 1959 was a determination that petitioner realized unreported capital gain of $ 27,072.26 on the sale of Lot 5, Riviera Estates, computed as follows:
Sales Price of Lot 5, Riviera Estates
$ 30,048.20
Cost
$ 8,994.03
Less Depreciation Allowed
6,018.09
2,975.94
Capital Gain Determined
$ 27,072.26
In 1950 petitioner purchased Lot 5 of the Riviera subdivision for $ 7,500 and Lot 6 of the Riviera subdivision for $ 14,500, on which he resided until 1958. In 1958 petitioner *212 sold Lot 6, on which his residence was located, for $ 100,000, and purchased undeveloped property in Boca de Canon for $ 57,000, on which he built a residence at a total cost for the house and lot of $ 157,110.09. In 1959 petitioner sold Lot 5 of the Riviera subdivision for $ 31,700.
No gain or loss as such was reported on petitioner's 1959 return for the sale of Lot 5 but the return contains several entries relating to this transaction. In a schedule headed "Capital Gains and Losses" is listed a gain item, "Depreciation on lemon grove," of $ 4,810.64. On the same schedule is listed a gain item, "Abandonment," of $ 8,394.87. Both of these figures were used in computing a reported net long-term capital gain for the year of $ 3,674.69. The figure of $ 8,394.87 is the sum of two figures appearing on another schedule of the return, one being depreciation on lemon trees and sprinklers for the first four months of 1959 of $ 221.49 and another item, "Abandonment," of $ 8,173.38. The return also lists an item of $ 8,394.87 under Schedule H "Other Income" labeled "Lemon Grove Loss" which was subtracted in computing a loss deduction of $ 4,105.62 shown on the face of the return. Petitioner *213 thought the gain on the sale of Lot 5 should not be recognized as taxable gain in 1959 and in reaching this opinion he relied upon a standard, well-known tax guide. The omission from his 1959 return of the facts concerning the sale of Lot 5 of the Riviera subdivision was not part of an effort to mislead or defraud the Government.
On his return for 1960, petitioner with intent to evade and defeat tax falsely reported income of $ 380.25, expenses of $ 615.95 and depreciation of $ 1,000 with respect to a citrus grove on his property. On his return for 1961, petitioner with intent to evade and defeat tax falsely reported income of $ 347.25, expenses of $ 730.15 and depreciation of $ 1,000 with respect to these activities. Petitioner did not have a large orchard of citrus trees in 1960 and 1961 and he did not have income, expenses, or deductible depreciation on fruit trees in those years.
On December 3, 1965, petitioner had a conference with members of the staff of the district director of internal revenue, Los Angeles, California, concerning petitioner's return for the year 1959. At or about the time of that conference, respondent denied petitioner's request for additional conferences *214 for the year 1959, and denied petitioner's request for conferences as to his 1960 return.
Petitioner, without any authority to do so, wrote Martha Jane Brown's name on the returns, the petitions and two stipulations of facts lodged with the Court. Petitioner was not truthful when he testified that Martha Jane Brown signed the returns and the petitions filed with the Court for the years 1959, 1960, and 1961.
Ultimate Facts
Petitioner filed a separate return for 1959 and such return was not false or fraudulent and no part of any deficiency for that year was due to fraud.
In each of the years 1960 and 1961 petitioner received large amounts of income from his practice of medicine, as determined by use of the bank deposits method, which were omitted from his returns with a purpose to evade or defeat tax known to bedue for those years. In each of the years 1960 and 1961 petitioner fraudulently claimed deductions for citrus grove losses, including depreciation on fruit trees, when he had no citrus grove or other fruit trees managed as a business. Petitioner filed false or fraudulent returns for 1960 and 1961 and part of the deficiencies for those years was due to fraud. Petitioner has *215 failed to carry his burden of proof as to the incorrectness of the deficiencies determined for 1960 and 1961 except as to items detailed in the foregoing findings.
Opinion
Respondent sent notices of deficiencies to petitioner, M. Hunter Brown, and his former wife, Martha Jane Brown, for the years 1959, 1960, and 1961 and timely petitions were filed in this Court for the redetermination of all such deficiencies. At the trial Martha Jane Brown testified that she neither signed nor authorized anyone else to sign or file on her behalf either the income tax returns or the petitions filed in this Court for such years. Believing her testimony, we granted respondent's motions to dismiss the petitions for lack of jurisdiction as to Martha Jane Brown as detailed in our findings, leaving only the petitions filed by petitioner, M. Hunter Brown, before the Court.
Respondent has determined the disputed deficiencies in petitioner's Federal income tax returns for 1959, 1960, and 1961 by use of the bank deposits method and determined fraud penalties under section 6653(b). [3] *216 He concedes that, absent fraud, assessments of deficiencies for 1959 and 1960 are time barred. [4]
Petitioner advances a number of arguments: (1) That his books and records were adequate so that respondent's use of the bank deposits method in redetermining petitioner's taxable income was unwarranted; (2) that even if his books and records were inadequate the respondent's calculations are so erroneous as to invalidate his determinations; (3) that respondent's determinations are based on bank records obtained by summonses in violation of petitioner's rights under the Fourth and Fifth Amendments; and (4) that respondent's denial of petitioner's requests for district conferences violated the rules and regulations of the Internal Revenue Service, rendering the notices of deficiency null and void. The final issue, of course, is whether the returns were false or fraudulent and whether any part of the deficiency *217 for each year was due to fraud.
Issue 1: Adequacy of Books and Records
A taxpayer is required to maintain books and records which clearly reflect his income. When his books are inaccurate or incomplete, the Commissioner is authorized to resort to other, less direct, means of ascertaining income. Schwarzkopf v. Commissioner [57-2 USTC P 9816], 246 F. 2d 731, 1958-1 C.B. 508 (C. A. 3, 1957), affirming a Memorandum Opinion of this Court [Dec. 21,835(M)]. Petitioner contends, however, that his records were accurate, and that respondent, therefore, was without authority to utilize the bank deposits method of reconstructing income. We cannot agree.
Petitioner's income tax return for 1957 was audited in 1959. At that time the investigating agent concluded that petitioner's records, consisting solely of small ledger cards for each patient, were inadequate and so advised, petitioner. That petitioner's records during the years now before us were no better is amply supported by the evidence. We note, for example, that petitioner stipulated at trial that he received and deposited in 1959 at least nine checks totaling $ 2,610 and, in 1960, 15 checks totaling $ 8,535.80 from patients although *218 they were not listed on the patient cards. Our findings show that other income was received which was not deposited. Although petitioner kept a day book at least for 1961, [5] the evidence is clear that it was not consistent with either the patient ledger cards or the bank deposits. Thus, we are convinced that petitioner's records did not accurately reflect his income. The tax must be applied to his true income, not to what his records show it was.
But even if a taxpayer's books are "perfect"--an appellation totally inconsistent with the facts here--the Commissioner may use the bank deposits method to test the accuracy of the records. And if such a test discloses large *219 amounts of income not reflected in the taxpayer's books, this is cogent evidence of the inadequacy of the taxpayer's records. Lipsitz v. Commissioner [Dec. 20,212], 21 T. C. 917, 931 (1954), affd. [55-1 USTC P 9375] 220 F. 2d 871 (C. A. 4, 1955), certiorari denied 350 U.S. 845 (1955); Harry Gleis [Dec. 21,204], 24 T. C. 941 (1955), affd. per curiam [57-1 USTC P 9451] 245 F. 2d 237 (C. A. 6, 1957). And, indeed, respondent's investigation here disclosed large amounts of omitted income. In the absence of reliable records it was necessary and proper for respondent to compute petitioner's income on the basis of his bank records. Louis Halle [Dec. 15,243], 7 T. C. 245 (1946), affd. [49-1 USTC P 9295] 175 F. 2d 500 (C. A. 2, 1949), certiorari denied 338 U.S. 949 (1950).
Issue 2: Validity of Respondent's Calculations
Petitioner's second argument is that respondent's calculations were so inaccurate as to destroy their validity for any purpose. He requests the Court to find that at least part of this inaccuracy is traceable to the fact "that the Internal Revenue Service willfully and *220 fraudulently attempted to confiscate property of the Petitioner by manipulation of bank deposit records, fabrication of so-called missing items, and falsification of the total of his business receipts."
In support of his contention that respondent's figures are grossly incorrect, petitioner challenges respondent's calculation of bank deposits for 1961. At trial, petitioner introduced his check "ledgers" (i.e., check book stubs) which he claimed showed his total deposits to his checking account at the Westwood Village Branch of Security First National Bank. Respondent determined that the deposits totaled $ 11,945.50. Petitioner contends on brief that the correct total is $ 8,781.50, but his own exhibits (his check ledgers) show deposits of $ 10,789.50. The difference of $ 1,156.00 between the total of the amount shown on petitioner's check ledgers and the amount determined by respondent is traceable to a deposit noted on petitioner's ledger as of December 31, 1960, but on the bank records as of January 3, 1961. As explained in our findings, we have treated this amount of $ 1,156.00 as a deposit in 1960 rather than in 1961.
Also, petitioner notes a discrepancy in the amount deposited *221 with Citizens National Bank in 1961. Petitioner introduced into evidence deposit slips totaling $ 53,359.57, while respondent contends that the correct amount is $ 53,602.57. The difference of $ 243 may be traced to two deposits not reflected among his deposit slips, one on March 27, 1961 of $ 223 and another on September 22, 1961 of $ 20.
In support of his contention that the revenue agents were biased or incompetent, petitioner cites the numerous audits to which his returns have been subjected. But he fails to take into account the inadequacies of his records and the consequent duty cast on the revenue agents to establish the amount of his taxable income by indirect methods. He also notes that Revenue Agent Long assigned a selling price of $ 100,000 to a piece of property sold by petitioner although the amount of cash received was only $ 74,348.93. The escrow agreement on this sale indeed reflects a $ 100,000 sales price. What petitioner fails to realize on this point is that the amount received included more than the net price received--for example, the retirement of a mortgage of $ 19,425.72 plus accrued interest.
We have carefully considered all of petitioner's allegations, *222 but, while we have made some adjustments to respondent's figures, we find no support for petitioner's charges. Indeed, we believe, and we have so found, that the revenue agents used all reasonable effort to arrive at the closest approximation possible. Petitioner's second argument is rejected.
Issue 3: Summonses for Bank Records
Petitioner's bank records for 1958-1961, as detailed in our findings, were the subject of numerous administrative summonses by respondent. At least some of the bank records for which summonses were issued were for years not being audited at the time the records were demanded. For example, the audit of petitioner's tax return for 1959 began in August 1961, and at that time a summons was issued to Security First National Bank for petitioner's records for the period 1958-1960. Petitioner contends that this action renders the deficiencies determined by use of these records null and void, since, he claims, the records were seized in violation of the Fourth and Fifth Amendments to the Constitution. [6] The Fourth Amendment is violated, petitioner asserts, when bank records are summoned prior to an audit of the tax year, because respondent cannot have probable cause *223 to suspect understatement of income until a taxpayer's business records are checked. In addition, he contends, when a revenue agent auditing a return "cases" bank records prior to an audit, his objectivity is impaired per se. "It is unrealistic to assume," petitioner argues, that "an auditor who knows one man's worth is $ 500 and another's is $ 500,000 would not be influenced in the arbitration of these deductions."
Section 7602(1)[7] provides for the issuance of a summons "to examine any books, papers, records, or other data which may be relevant or material" to an inquiry into the tax liability of any person. Petitioner's argument must be viewed in light of this Congressional authorization.
*224 At the outset, it should be noted that petitioner may well be without standing to contest the summonses since the property "seized" was that of the banks. See In re Cole [65-1 USTC P 9271], 342 F. 2d 5 (C. A. 2, 1965), certiorari denied 381 U.S. 950 (1965); Foster v. United States [59-1 USTC P 9330], 265 F. 2d 183, 187-188 (C. A. 2, 1959), certiorari denied 360 U.S. 912 (1959); De Masters v. Arend [63-1 USTC P 9233], 313 F. 2d 79, 85 fn. 11 (C. A. 9, 1963), certiorari dismissed 375 U.S. 936 (1963): "Fourth Amendment rights do not depend upon nice distinctions of property law * * * but the taxpayers had no interest in the bank's records of the kind the Fourth Amendment was intended to protect."
Quite apart from petitioner's lack of standing, we do not believe it possible to equate the summons issued pursuant to section 7602 with an unreasonable search and seizure. See United States v. Harrington 388 F.2d 520, [68-1 U.S. Tax Cas. (CCH) P9178] (C. A. 2, Jan. 18, 1968); United States v. Powell [64-2 USTC P 9858], 379 U.S. 48, 13 L. Ed. 2d 112, 85 S. Ct. 248 (1964); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209, 90 L. Ed. 614, 66 S. Ct. 494 (1946); *225 Foster v. United States, supra; cf. See v. City of Seattle, 387 U.S. 541, 544-545, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967). What the Supreme Court said in United States v. Powell, supra, at 53-54, with regard to examinations under section 7605(b), Internal Revenue Code of 1954[8] is equally applicable to section 7602:
Although a more stringent interpretation is possible, one which would require some showing of cause for suspecting fraud, we reject such an interpretation because it might seriously hamper the Commissioner in carrying out investigations he thinks *226 warranted, forcing him to litigate and prosecute appeals on the very subject which he desires to investigate * * *.
Turning to the facts of this case, the relevancy of the material requested within the meaning of section 7602(1) is apparent. Since transactions affecting a determination of income for a particular year may be spread over more than one year, as may practices such as continuous understatement of income, it is indeed relevant to "bracket" tax years being audited. And, since these records may themselves be indicia of inadequate books and records, no preliminary audit was necessary to establish a basis for the summonses.
Petitioner's argument that he was denied due process of law within the meaning of the Fifth Amendment is also without merit, for even assuming that knowledge of the tax bracket of the taxpayer would influence the position of the auditor, we do not believe this is what the Fifth Amendment protects against. Nor, indeed, is there a scintilla of evidence in the record to indicate the existence of bias.
Issue 4: Denial of District Conferences
Petitioner argues that respondent's denial of a district conference for tax year 1960and the failure to "complete" *227 the conference for 1959 renders the subsequent deficiency notice null and void. This contention has been considered by this Court and other courts on more than one occasion and has been rejected. The conference procedure announced by the Commissioner in 26 C. F. R. sec. 601.105 is discretionary, and the rules promulgated are directory, not mandatory. They do not curtail the power conferred upon the Secretary of the Treasury or his delegate to send a notice of deficiency if he concludes a deficiency exists. Luhring v. Glotzbach [62-2 USTC P 9547], 304 F. 2d 560 (C. A. 4, 1962); Philip F. Flynn [Dec. 26,237], 40 T. C. 770 (1963).
Issue 5: Fraud
Since we have found petitioner's "procedural" arguments without merit, we turn to the issue of fraud. We approach the task of finding whether the returns were false or fraudulent under section 6501(c)(1) and whether any part of the deficiencies was due to fraud within the meaning of section 6653(b) knowing that the trial record made by petitioner was inadequate. Petitioner has chosen, despite his affluence and lack of accounting knowledge, to keep his business records and to handle his *228 tax controversies without either accounting or legal assistance. The result at the trial was a disorganized defense of disorganized business records, without benefit of either adequate cross-examination to test the accuracy of the testimony of the respondent's agents or substantial direct testimony to support the truthfulness of the returns. We must, nevertheless, make our findings on the basis of the record before us, for we are not permitted to speculate as to what the trial record might have been had petitioner been represented by trial counsel.
The general guidelines are familiar ones. Respondent has the burden to prove fraud for each year. Section 7454, Internal Revenue Code of 1954. To carry this burden requires proof by clear and convincing evidence of intentional wrongdoing with the specific purpose of evading a tax believed to be owing. The test is the intent at the time the return is filed, not some earlier or later date. Harry Gleis [Dec. 21,204], 24 T. C. 941 (1955), affd. per curiam [57-1 USTC P 9451] 245 F. 2d 237 (C. A. 6, 1957); Estate of William Kahr [Dec. 28,617], 48 T. C. 929 (1967). But intent *229 alone is insufficient, for fraud requires both intent and action. If the taxpayer intends to defraud the Government, but his return is inadvertently correct, he cannot be found liable for fraud. If there is no deficiency there is no fraud. Jenkins v. United States [63-1 USTC P 9289], 313 F. 2d 624, 627 (C. A. 5, 1963); Elfmon v. United States [54-1 USTC P 49,017], 209 F. 2d 642, 643 (C. A. 4, 1953); In re Parr [62-2 USTC P 9708], 205 F. Supp. 492, 496 (S. D. Tex. 1962). However, if any part of the deficiency is due to fraud, then the penalty attaches to the total deficiency. Section 6653(b).
We have sought faithfully to observe these well-established principles and we have concluded that respondent has failed to carry his burden to prove the requisite fraud as to 1959 but that he has established that petitioner's returns for 1960 and 1961 were fraudulent and that at least part of the deficiencies for those years was due to fraud.
(a) 1959
At the outset we are faced with the problem whether the finding as to fraud should be made by viewing the 1959 return as a joint return or as a separate return. On its face it is a joint return, bearing *230 the names of both the petitioner and Martha Jane Brown, his former wife, [9] and it includes the community income of both. But in support of his motion to dismiss for lack of jurisdiction the petitions as to the former Martha Jane Brown, respondent offered her testimony that she did not sign or authorize anyone else to sign her name to the petitions and certain stipulations and also that she did not sign or authorize anyone else to sign or file tax returns on her behalf for any one of the three years, including the purportedly joint return for 1959. As has been noted in our findings of fact, we believed this testimony and granted respondent's motion.
Respondent, as evidence of petitioner's fraud, continued to emphasize this point at trial and on brief. He has requested findings of fact--which, in substance, we have made--that "petitioner was not truthful about the signatures of Martha Jane *231 Brown on returns and petitions" and that "the petitioner wrote Martha Jane Brown's name to the returns." Respondent also requested a finding that "petitioner claimed to have a power of attorney from his wife which he refused to bring into Court. His wife laterdenied having given him such a power of attorney." And, on brief, respondent argues that "petitioner's final acts of fraud occurred in the presence of the Court in his vain attempt to avoid his true tax liability. He was untruthful about a power of attorney and refused to bring it into Court though the Court allowed him time to search for it. He was untruthful about signatures of Martha Jane Brown's name on returns and petitions. * * * These acts clearly show the petitioner's continuing fraudulent intent to avoid his proper tax liability for the years concerned and his continuing attempts to hide the falsity of his returns."
On the record before us we cannot find that Martha Jane Kaestner was truthful and accurate as to all her testimony except the signing and authorization of the 1959 return. Having believed her testimony and having rejected that of petitioner as to the signing of the petitions filed with this Court, and as *232 to the returns for 1960 and 1961, we have no basis for an opposite finding as to the 1959 return. Accordingly, we have found that she neither signed nor authorized petitioner to sign or file a 1959 return on her behalf.
As a matter of law, then, was the 1959 return which included her share of the community income and which bore the name of Martha Jane Brown a joint return or a separate return for the purpose of determining petitioner's 1959 liability? We have concluded that it cannot be treated as a joint return but, instead, must be treated as petitioner's separate return not only for the purpose of determining the extent of his liability but also for the purpose of determining whether it was fraudulent. We do not hold that petitioner's act of filing the purportedly joint return was in and of itself part of a fraudulent scheme, only that as a matter of law under the evidence it must be treated as a separate return.
Section 1.6013-1(a)(2), Income Tax Regs., provides that "[A] joint return of a husband and wife (if not made by an agent) shall be signed by both spouses" and that where one spouse signs a return as agent for the other or where a third person signs such a return the provisions *233 of the regulations relating to returns by agents (section 1.6012-1(a) (5), Income Tax Regs.) shall apply. Since the return was not signed or authorized by petitioner's former spouse it was not a joint return. There was obviously lacking the mutual intent to claim the benefits of a joint return. Manton v. Commissioner [Dec. 16,690], 11 T. C. 831 (1948);Bour v. Commissioner [Dec. 20,655], 23 T. C. 237 (1954); Brown v. Commissioner [Dec. 21,024], 24 T. C. 256 (1955); Alma Helfrich [Dec. 21,365], 25 T. C. 404 (1955). The fact that the income of both spouses was included in the return does not require that it be treated as a joint return; this is only one factor to be considered. Elsie S. Bour, supra; McCord v. Granger [53-1 USTC P 9134], 201 F. 2d 103 (C. A. 3, 1952). And there is no evidence whatever that petitioner's former spouse participated in the preparation of the return. Cf. Muriel Heim [Dec. 22,009], 27 T. C. 270 (1956), affd. [58-1 USTC P 9202] 251 F. 2d 44 (C. A. 8, 1958).
This is not an appropriate case for application of the so-called "tacit consent" *234 rule under which tax liability is imposed on a spouse whose income is included in a purportedly joint return even though the spouse's signature is missing. Cf. Kann v. Commissioner [Dec. 19,194], 18 T. C. 1032 (1952), affd. [54-1 USTC P 9144] 210 F. 2d 247 (C. A. 3, 1953), certiorari denied 347 U.S. 967 (1954). "The tacit consent presumption is nothing more or less than the presumption of correctness attaching to the Commissioner's determination that a joint return was, in fact, intended." 8A Mertens, Law of Federal Income Taxation, sec. 47.09, p. 23. Here, it was the respondent who presented the testimony showing the falsity and the lack of authorization of the Martha Jane Brown signature.
We emphasize this point: This is not a case where a taxpayer has misled the respondent by filing a purportedly joint return and now seeks to take advantage of his own wrongdoing by disavowing it as a joint return. The foundation for treating the 1959 return as a joint return was destroyed by the respondent's own witness whose testimony we believed.
Treating the 1959 return as the separate return of petitioner there is still, possibly, a deficiency for that year. *235 But, even so, an analysis of the evidence precludes a determination that the return was false or fraudulent within the meaning of section 6501(c)(1), or that any part of such deficiency is due to fraud within the meaning of section 6653(b).
The adjustments made in the 1959 notice of deficiency were as follows:
Additional Income and Unallowable
Deductions:
(a) Profit from Business
$ 16,282.16
(b) Capital Gain Income
8,178.37
(c) Lemon Grove Loss
8,394.87
(d) Income from Estate of William
D. Hunter
$ 1,332.55
(e) Dividend Income
883.73
(f) Interest Income
63.21
(g) Contributions
240.00
Additional Deductions [Allowed]:
(h) Loss on Oil Lease
2,352.20
(i) Interest Expense
10.03
(j) Taxes Expense
267.62
(k) Investment Expenses
562.50
The items relied upon by respondent in his brief to show fraud for 1959 are unreported business receipts, overstatement of deductions, and failure to report a large capital gain.
(1) Petitioner reported business receipts of $ 39,086.31 and respondent determined by the bank deposits method that the correct amount was $ 49,676.29, a total omission of $ 10,589.98. Thus, the sum reported exceeds petitioner's community *236 one-half of the total income, the amount reportable by him on a separate return.
(2) Respondent offered no evidence to show that the disallowed business deductions, which were as follows, were fraudulently claimed:
Per Return
As Corrected
n.10Adjustment Automobile expense
$ 2,492.61 $ 851.87  $ 1,640.74 Entertainment and promotion expense
2,711.55 1,293.85  1,417.70 Home office expense
2,533.26 -0-    2,533.26 Telephone expense
714.52 476.03  238.49 n.10 The petitioner failed to claim $ 138.01, the amount of employment tax paid on his secretary's salary.
The automobile expense allowed was computed by eliminating a portion of the expenses claimed on the ground that the automobile was used by petitioner for commuting from his residence as well as for business purposes. But no evidence was presented by respondent as to the comparative amounts of such use. The entertainment expense deduction was reduced by limiting the deduction to "supported *237 expenditures" but no evidence was offered to show that the disallowed portion did not, in fact, represent allowable expenses. Home office expenses were eliminated but no serious effort was made to show that the petitioner did not in fact use a part of his residence for office purposes. Martha Jane Kaestner, no doubt, knew whether petitioner's claim was truthful but respondent elicited no testimony from her on this point. The telephone expense deduction was adjusted by allowing all office telephone expense and allowing a deduction for a home telephone at the basic rate, thus eliminating all long distance or toll calls on the home telephone. Here, again, respondent offered no affirmative evidence to justify this adjustment.
These adjustments of claimed deductions were sufficient, in the absence of evidence to the contrary, to support a determination of a deficiency. But the failure of a taxpayer to overcome the presumption of correctness does not of itself create a presumption of fraud. And, in the absence of affirmative evidence that the disallowed portions of the deductions were clearly unallowable and that the petitioner must have known they were not allowable, they cannot be relied *238 upon to support a finding of fraud. See Carter v. Campbell [59-1 USTC P 9306], 264 F. 2d 930, 936 (C. A. 5, 1959); Drieborg v. Commissioner [55-2 USTC P 9632], 225 F. 2d 216, 218 (C. A. 6, 1955).
(3) There remains the capital gains item. In the notice of deficiency for 1959, as noted in our findings of fact, it was determined that petitioner realized a capital gain of $ 27,072.26 on the sale of Lot 5, Riviera Estates. At the trial it was stipulated that the petitioner bought Lot 5 of the Riviera subdivision in November 1950 for $ 7,500 and sold the same lot in 1959 for about $ 31,700. On the basis of these facts, respondent argues that petitioner fraudulently failed to report the resulting capital gain on his 1959 return.
We cannot sustain respondent's argument for a number of reasons. The entries on the 1959 return concerning this transaction are inconsistent with an intent to conceal it. The inclusion of two gain items on the return, including depreciation he thought he was required to "repay" the Government, and the deduction for "abandonment" were so unusual that they were bound to attract the attention of the revenue agents. Cf. National Land Co. [Dec. 3512], 10 B. T. A. 527, 529 (1928). *239 We believe that these items were handled in this manner through ignorance of the tax law rather than as a part of a deliberate attempt to mislead the respondent. "A mistake of law, if it was a mistake, is not equivalent to the fraud withintent to evade tax named in the statute." Welburn Mayock [Dec. 23,700], 32 T. C. 966, 974 (1959).
Petitioner's explanation of his failure to report the gain as such was that, in his view, the sale of Lot 5 resulted in no recognizable gain. With a copy of a page of a well-known tax guide in hand, he testified that, prior to 1958, his residence included both Lots 5 and 6, that he sold Lot 6 in 1958 with the house on it for $ 100,000, and Lot 5 in 1959 for $ 31,700, a total of $ 131,700, and used the proceeds to buy the Boca de Canon property and to construct a house thereon at a total cost (shown by a net worth computation introduced in evidence by respondent) of $ 157,110.09. Bogley v. Commissioner [59-1 USTC P 9270], 263 F. 2d 746 (C. A. 4, 1959), according to the tax guide, interprets the predecessor of Code section 1034 to provide that the entire property comprising an "old" residence need not be sold in a single transaction *240 in order to obtain the section's nonrecognition benefits. Accordingly, petitioner maintains that he had no gain to be recognized in 1959 from the sale of Lot 5. Without passing. on the legal merits of petitioner's position, we are convinced that it has sufficient legal and factual basis to negate fraud in the way the transaction was handled on the 1959 return. Under the law he should have reported the transaction as such even if no gain were to be recognized. But, again, an honest mistake as to a doubtful legal point is not fraud with intent to evade tax. Welburn Mayock, supra.
Thus we conclude that respondent has failed to prove the requisite fraud for 1959 to lift the bar of limitations undersection 6501(c)(1) or to support fraud penalties under section 6653(b). The 1959 return contains errors but the only item shown possibly to have been intentionally misreported is business receipts. And, as stated above, the return included a sum in excess of petitioner's community one-half of such receipts. [11]
*241 (b) 1960 and 1961
The trial record considered as a whole convinces us that respondent has established that at least a part of the deficiencies for 1960 and 1961 was due to fraud. This conclusion is supported by (1) a pattern of deliberate, substantial, unexplained understatements of income over a period of years, and (2) the intentional overstatement of deductions in each of these years.
(1) Substantial understatement of income. We have found that petitioner had unreported community business receipts in the following amounts:
1959
1960
1961
Corrected business receipts
$ 49,676.29
$ 61,601.66
$ 50,283.58
Business receipts per returns
39,086.31
44,624.04
47,347.86
Unreported business receipts
$ 10,589.98
$ 16,977.62
$ 2,935.72
As our findings indicate, respondent's evidence as to these receipts was substantially uncontested. Indeed, as noted above, petitioner stipulated that in 1959 nine checks totaling $ 2610 and, in 1960, 15 checks totaling $ 8,535.80 were received from patients and deposited, yet not listed on his ledger cards or reported on his returns. These omissions, moreover, fell on the heels of the audit of petitioner's 1957 return. *242 We have taken the 1959 omissions into account even though, for the reasons stated, we have treated the return for that year as a separate return. Since petitioner admittedly purported to report all the 1959 community business income, we think it may properly be considered a part of the total picture of deliberate understatements of income.
Nor is it possible to contend that petitioner did not know his returns understated income. The understatements for 1959 (when the return is viewed as a joint return) and 1960 were substantial both in amount per se and in relation to total receipts. Petitioner opened his mail and made deposits. He received bank statements. Indeed, in each of the years in question petitioner represented to Citizens National Bank that his business income was $ 50,000, although his returns reported less. The difference between the amount ofbusiness income received and the amount reported for 1961 was far less than for the previous two years, however, and we would hesitate to find fraud for 1961 on this evidence alone. See Denny York [Dec. 21,149], 24 T. C. 742 (1955). But as we shall indicate there are other factors affecting our conclusion.
The courts *243 have repeatedly said that a substantial omission or understatement of income together with a pattern of repetition over a period of years, in the absence of a tenable explanation, may be considered as strong evidence of fraud, even though the other usual badges of fraud are not shown. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127, 1954-2 C.B. 215 (1954); Woodham v. Commissioner [58-2 USTC P 9592], 256 F. 2d 201 (C. A. 5, 1958), affirming a Memorandum Opinion of this Court [Dec. 21,361(M)].
If the 1959 return stood alone it might be concluded that the omissions from it (viewed as a joint return) were due to negligence or carelessness or petitioner's part in keeping records which were inadequate and unreliable. The loose ledger cards could easily be lost or misplaced and income could easily escape notice in the preparation of returns through the shifting of patient's cards forward to a year in which additional service was performed. We recognize that negligence, whether slight or great, is not equivalent to fraud with intent to evade the tax. Mitchell v. Commissioner [41-1 USTC P 9317], 118 F. 2d 308 (C. A. 5, 1941), reversing [Dec. 10,799] 40 B. T. A. 424 (1939). *244 However, the notice served on petitioner on November 3, 1959 stated that his records were inadequate and called to his attention Code sections 6001 and 7203 as well as various regulations on the necessity for keeping adequate records. The revenue agent who delivered the notice explained to petitioner that he should keep a cash journal in which he should record every receipt. Petitioner filed his returns for all three years after receiving such notice and advice. He might not have been able to revise his records for all of 1959 at that point but as to 1960 and 1961 he could have instituted a more adequate record keeping system. His deliberate failure to do so, we are forced to conclude, was due to an intention to profit tax-wise through use of his inadequate system. Factor v. Commissioner [60-2 USTC P 9551], 281 F. 2d 100 (C. A. 9, 1960), affirming a Memorandum Opinion of this Court [Dec. 22,992(M)], certiorari denied 364 U.S. 933 (1961); Powell v. Granquist [58-1 USTC P 9223], 252 F. 2d 56 (C. A. 9, 1958).
(2) Intentional Overstatement of Deductions. On his return for 1960, petitioner reported citrus receipts of $ 380.25 and expenses and *245 depreciation attributable to his "citrus grove" of $ 1,615.95. Similarly, for the year 1961, petitioner reported receipts of $ 347.25 and expenses and depreciation of $ 1,730.15. Thus, petitioner reported a net deductible loss on his "farming activities" of $ 1,235.70 in 1960 and $ 1,382.90 in 1961. [12] Petitioner testified, firmly and unequivocally, that he had a citrus grove of 80 to 85 mature lemon trees. Yet Frank Arevalo, petitioner's gardener, testified as follows:
Q. Would you describe for me the kind of fruit trees that were located on Dr. Brown's half of the property during 1959, approximately, can you tell me approximately what kind of fruit trees there were there?
A. There were about three or four avocados, about five big orange trees, a lime tree, and about three or four young trees that we put in. I mean there were some small ones we put in.
Q. Young trees that we put in, yourself?A. Dr. Brown.Q. Dr. Brown ordered them put in?A. Yes.
Q. On Dr. Brown's part of the property was there something that was referred to as an upper orchard and a lower orchard?
A. Yes. The orange orchard and the avocado was more or less the lower orchard and the upper orchard would be *246 the fruit trees, which would be apricot and plum trees, and so forth.
Q. Were there any lemon trees in the upper orchard?A. No, sir.Q. Were there any lemon trees in the lower orchard?A. Yes; I would say there were about three or so.Q. Were these mature trees?
A. The doctor and I put in about three lemon trees.
This testimony went substantially unchallenged by petitioner on cross-examination. In his Reply Brief petitioner states that "Respondent's agents personally checked this property; they were well aware that it contained three rows of citrus trees, not three citrus trees, a row of avocado trees, a hillside containing approximately forty fruit trees, and a neighboring orchard of fifty lime trees." But petitioner made no such suggestion in the cross-examination of Arevalo, and did not seek to elicit testimony to this effect from respondent's agents. The issue, then is one of credibility.
We have found as a fact that the petitioner was untruthful *247 about the purported signatures of his former wife to the returns and petitions. [13] Whether or not such statements are evidence of fraud, they make it far more difficult to accept the credibility of petitioner's self-serving testimony as to the citrus trees. On this record we must conclude that there was no basis for the deductions claimed, and that they were fraudulent. On the other hand, there would also seem to be no basis for the farm income reported in the returns and not deleted from income in the deficiency notice. The income was apparently reported only to provide a basis for the deduction. Thus, we have reduced respondent's determination of petitioner's income by the amounts included as "farm receipts" for 1960 and 1961.
We believe *248 respondent has satisfied his burden of showing that part of the claimed deficiency was due to fraud for 1960 and 1961. He has shown that petitioner fraudulently understated his income and overstated his deductions in each year and that a citrus grove was created out of thin air for 1960 and 1961, cf. Goldberg v. Commissioner [38-2 USTC P 9439], 100 F. 2d 601 (C. A. 7, 1938), affirming [Dec. 9669] 36 B. T. A. 44 (1937), certiorari denied 307 U.S. 622 (1939). Since fraud has been shown for 1960, the deficiency for that year is not barred by the statute of limitations.
Issue 6: Failure to Pay Estimated Income Tax
Petitioner failed to make estimated income tax payments when due for the year 1960. Consequently, he is liable for the addition to tax under section 6654(a). [14]
*249 Decision will be entered for petitioner in Docket No. 2209-66. Decisions will be entered under Rule 50 in Docket Nos. 1971-66 and 3387-65. Footnotes
2. The findings as to amounts of income which follow refer to the total community income of the petitioner and his former wife unless otherwise stated even though petitioner filed a separate return for each year.↩
3. SEC. 6653↩. FAILURE TO PAY TAX. * * * (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).
4. SEC. 6501↩. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions.-- (1) False Return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.
5. Petitioner testified that he also kept day books for 1959 and 1960, subsequent tonotification by respondent that his ledger cards were considered inadequate records. He did not produce these records at trial. In light of the evidence in the record, we cannot assume these books would have accurately reflected petitioner's income for those years.↩
6. We have regarded petitioner's objections in his opening statement as a timely objection to the admissibility of any evidence obtained through the use of the administrative summonses.↩
7. SEC. 7602↩. EXAMINATION OF BOOKS AND WITNESSES. For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized-- (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry; * * *
8. SEC. 7605↩. TIME AND PLACE OF EXAMINATION. * * * (b) Restrictions on Examination of Taxpayer.--No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.
9. The former Martha Jane Brown has since remarried. She sometimes will be referred to hereinafter as Martha Jane Kaestner.↩
11. This is not a situation permitting a conclusion that the return was false or fraudulent within section 6501(c)(1) even though no part of the deficiency is due to fraud. Compare Summerill Tubing Co. [Dec. 9720], 36 B. T. A. 347 (1937); see also Estate of Harry Stoll Leyman [Dec. 26,081], 40 T. C. 100, 131 (1963), modified, [65-1 USTC P 12,303] 344 F. 2d 763↩ (C. A. 6, 1965).
12. No similar items appear on the return for 1959.↩
13. Petitioner may have thought the divorce decree obligating him to hold his former wife harmless from tax claims authorized him to act on her behalf. But he had no right to take liberties with the truth when confronted with direct questions as to who signed these documents.↩
14. SEC. 6654↩. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX. (a) Addition to the Tax.--In the case of any underpayment of estimated tax by an individual * * * there shall be added to the tax under chapter 1 * * * for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)).